In re Louis J. PROVENZA.

**NORTHSHORE NEUROLOGICAL SURGERY ASSOC., Debtors,**

**Louanne Friend, Plaintiff,**

**v.**

**Louis J. Provenza, Defendant.**

**Bankruptcy No. 00–11830.
Adversary No. 02–1030.**

United States Bankruptcy Court, E.D. Louisiana.

July 24, 2003.

182

Jerry Jackson Stamps, Teresa Lynn Witt–Stamps, Slidell, LA, for Louis J. Provenza, Debtor.

Alicia Bendana, Mark S. Goldstein, New Orleans, LA, for Louanne Friend.

## *MEMORANDUM OPINION*

JERRY A. BROWN, Bankruptcy Judge.

This proceeding comes before the court on the debtor Dr. Louis J. Provenza's objection to the claims filed by his ex spouse Louanne Friend,[1] and Ms. Friend's complaint objecting to the Chapter 7 discharge of the debtor's indebtedness to her,[2] which were tried together on November 5, 19, 21, 26, 2002 and January 28–30, 2003.

With the filing of Dr. Provenza's objection to Ms. Friend's proof of claim, the allowance or disallowance of that claim became a "contested matter." Ms. Friend's proof of claim includes her community partition claims, as well as all reimbursement claims, accounting claims, and claims for fraud and mismanagement. Resolution of this objection requires this court to partition the community property in accordance with the principles set forth at La. R.S. 9:2801.[3]

Ms. Friend's complaint objecting to the discharge of debtor's indebtedness to her

---

1. Pl. No. 622. This objection refers to Friend's proof of claim no. 57. Ms. Friend has stipulated that her other proofs of claim are withdrawn.

2. Pl. No. 455.

3. Even without Dr. Provenza's objection, it would have been necessary to partition the community property in order for the trustee to pay community debts and to identify and marshal that portion of the community surplus that will be available to pay Dr. Provenza's separate debts.

seeks a determination by this court that her allowed claim against the debtor be deemed non-dischargeable pursuant to 11 U.S.C. § 523(a)(15), and also that the fraud and mismanagement component of her claims against Dr. Provenza be deemed non-dischargeable pursuant to 11 U.S.C. § 523(a)(4) and (6). The court grants Ms. Friend's complaint objecting to discharge pursuant to 11 U.S.C. § 523(a)(15) and 11 U.S.C. § 523(a)(4), but denies that filed pursuant to 11 U.S.C. § 523(a)(6).

## I. FINDINGS OF FACT

### A. The Parties

1. The parties to this adversary proceeding are Louis J. Provenza, the debtor ("Dr. Provenza"), Northshore Neurological Surgery Associates, APMC ("Northshore"), also a debtor and Louanne Friend ("Ms. Friend"), Dr. Provenza's former spouse. Dr. Provenza and Ms. Friend were married in December, 1984. After marrying, they lived in Louisiana before moving to Florida in December, 1985. Sometime in 1987, the parties moved back to Louisiana where they have each resided since.[4] Northshore, the entity out of which Dr. Provenza practiced neurosurgery which was incorporated on January 1, 1996, and was the debtor-in-possession in case number 00–11831, which was administratively consolidated with the debtor's individual Chapter 11 case. The Northshore estate was wholly owned and managed at all pertinent times by the Provenza individual estate.

2. On September 18, 1998, Ms. Friend filed a petition for divorce in the 22nd Judicial District Court for the Parish of St. Tammany, State of Louisiana.[5] On May 11, 1999, a judgment of divorce was entered by that court.[6] The community of acquets and gains between Dr. Provenza and Ms. Friend was thus terminated effective September 18, 1998.[7]

3. From that date through October 24, 2001, when a Chapter 7 trustee was appointed, Dr. Provenza was in possession or control of virtually all of the parties' community and jointly owned property, with the exception of Ms. Friend's 1992 Lexus, Ms. Friend's VALIC retirement account, and one Northwestern Mutual life insurance policy.[8] There has been no partition of the community or jointly owned property.[9]

4. Dr. Provenza is a neurosurgeon, practicing in Slidell, Louisiana. In addition to practicing neurosurgery, Dr. Provenza has, over the years, invested in real estate, aircraft, and numerous wholly owned or closely held corporations, limited liability companies, and business ventures.

5. Ms. Friend is a registered nurse, teaching at Nicholls State University in Thibodaux, Louisiana as an assistant professor of nursing. Subsequent to the divorce, both Ms. Friend and Dr. Provenza have remarried other people.

### B. Bankruptcy Proceedings
#### 1. Chapter 11 Cases

6. These two cases started on March 29, 2000, when Dr. Provenza filed a volun-

---

4. Joint Pre–Trial Order, Statement of Uncontested Facts Nos. 1, 2, and 3; Trial transcript, November 5, 2002, Testimony of Louis Provenza, p. 35–36.

5. Joint Pre–Trial Order, Statement of Uncontested Facts No. 5.

6. *Id.* at 6.

7. Joint Pre–Trial Order, Statement of Uncontested Facts No. 9.

8. Tr. Tran., November 26, 2002, pp. 165–169.

9. *Id.* at 9.

tary petition under Chapter 11 of the Bankruptcy Code. Also on that day, Northshore, Dr. Provenza's wholly owned professional medical corporation, filed its voluntary Chapter 11 proceeding.[10]

7. Dr. Provenza's original bankruptcy schedules reported that he was insolvent, having debts totaling $2,941,750.83, and assets totaling $1,084,130.00.[11] Ultimately, after questioning and the presentation of indisputable evidence of much higher figures, Dr. Provenza disclosed liabilities totaling $3,390,187.21 and assets totaling $3,409,330.00.[12]

8. The signatures that purport to be those of Dr. Provenza[13] on various schedules, statements and other papers filed in the case are in fact the signatures of Dr. Provenza, despite his reluctance to identify them in court in the face of evidence demonstrating that they were in fact signed by him and filed by his counsel.

9. Dr. Provenza's original bankruptcy schedules failed to disclose various assets and such omissions were deliberate and not an oversight or accident.

10. Dr. Provenza was obligated to read the schedules and statements prior to signing them. Any errors contained therein are a result of his not reading them and cannot be blamed on the then counsel for Dr. Provenza.

11. Even after the filing of the initial schedules and statements, Dr. Provenza continued to omit disclosure of material assets including his interest in Northshore and at least one account, namely, the Bank One # 0626330248 account having $15,781.19 on deposit as of April 5, 2000, one week after the petition date. The existence of this account is determined from a careful review of Dr. Provenza's early monthly operating reports, as it is not disclosed in any version of his bankruptcy schedules.[14]

12. The Chapter 7 trustee liquidated Dr. Provenza's estate's non-exempt assets (not including the liquidation of Northshore) for a total gross recovery of $4,399,587.38,[15] sharply contrasting with Dr. Provenza's listed fair market values totaling $2,609,430.00 for these same properties in his amended schedules.[16]

13. The court finds this undervaluing and failure to include assets are a part of Dr. Provenza's pattern of evasion and deception.

14. On September 27, 2000, Dr. Provenza filed his original plan of reorganization and disclosure statement. The disclosure statement reported:

Dr. Provenza's practice is very profitable, but domestic relation problems and tax consequences have placed Dr. Provenza in a turbulent business position. Dr. Provenza intends to perfect a Plan that benefits all creditors and to emerge successfully with a confirmation of his

10. The two cases were administratively consolidated on May 24, 2001. Pl. 218.

11. Schedules dated April 28, 2000, Joint Ex. 10.

12. See Joint Exs. 12 and 13.

13. Id.

14. Joint Ex. 29, p. 20. Missing from this statement is the page that would show the daily collected balances.

15. See Joint Pre–Trial Order, Statement of Uncontested Facts Nos. 37, 39, 43, 45, 47, 49, 51, 53, 55, 57, 59, 62, 65, and Exhibit Friend 15.

16. The values listed in worksheets faxed by Dr. Provenza to his bankruptcy attorney on March 9, 2000 are significantly higher (and closer to the actual sales prices) than those Dr. Provenza ultimately listed in his schedules. Hence, the discrepancy between the numbers in F.of F. 7 and F.of F. 12.

Plan of Reorganization. It is Dr. Provenza's intention to continue working out a fair and equitable split of the community with his former spouse as well as finalizing an arrangement with both the Internal Revenue Service and Louisiana Department of Revenue to pay back taxes.[17]

15. During the debtor-in-possession period,[18] Dr. Provenza succeeded in substantially increasing the profitability of his practice, increasing his personal income for the year 2000 by more than fifty percent, as compared with the year 1999.[19]

16. During the one and a half year debtor-in-possession period, Dr. Provenza took no action to address his substantial pre-petition income tax indebtedness, disclosed in his schedules to be $833,000.00,[20] but rather, incurred additional unpaid income tax liability. Dr. Provenza's 2000 federal and state income tax returns show unpaid tax liabilities, net of penalties and interest which continue to accrue, of $112,553.00 and $16,767.00, respectively.[21] Dr. Provenza has neither filed his personal income tax returns for the year 2001, nor paid estimated taxes for the year 2002, nor withheld from his earnings for 2002.[22]

17. As Dr. Provenza's initial plan and disclosure statement, filed September 27, 2000, were met with objections filed by creditors,[23] he filed subsequent plans each

proposing full payment of the pre-petition income tax liability,[24] continued payment of the secured mortgage indebtedness on a contractual basis, and full payment of unsecured creditors over five years.

18. At trial, Dr. Provenza professed ignorance of the terms of his plans, and admitted that he did not know whether his proposed plans of reorganization were feasible.[25]

## 2. Events leading to the Chapter 7 Cases

19. Ultimately, and with a plan confirmation hearing scheduled for November 13, 2001, Dr. Provenza, on October 23, 2001, voluntarily converted his case to Chapter 7,[26] and on October 25, 2001, the court granted Ms. Friend's motion to convert Northshore to a Chapter 7 case.

20. Dr. Provenza's professed ignorance of the feasibility of his various proposed plans, his failure to pay post-petition taxes, and his conversion to Chapter 7 on the eve of confirmation, combined with other findings stated below, leads the court to find that Dr. Provenza's plans were not filed in good faith.

21. The appraisals provided by Dr. Provenza substantially understated the fair market values of these assets in his bankruptcy schedules and initial disclosure

---

17. Debtor's Disclosure Statement, September 27, 2000, Joint Ex. 339, page 14.

18. March 29, 2000 through on or about October 24, 2001, when both cases were converted to Chapter 7.

19. His reported personal compensation from his medical practice for the two years immediately preceding the bankruptcy was $932,190.00 for 1998 and $590,628.00 for 1999. See Joint Exs. 225 and 226. His reported compensation for 2000 was $808,846.00. See Joint Ex. 227.

20. Joint Ex. 12, Schedule E.

21. Joint Ex. at 227.

22. *See* Tr. Tran., November 5, 2002, p. 22

23. Joint Ex. 8, Pls. 104, 144, 147, and 166.

24. Dr. Provenza's Plans and Disclosure Statements failed to identify the additional unpaid tax liability accruing during the debtor-in-possession period.

25. Tr. Tran., November 5, 2002, pp. 117–120.

26. Joint Ex. 14.

statement. This undervaluing was part and parcel of Dr. Provenza's pattern of deception.

22. After a hearing on August 9, 2001, the court ruled on September 19, 2001, that the proper date for fixing the value of Northshore was the date of trial.[27] To try to expedite upcoming hearings on plans of reorganization, the parties had stipulated that if the court ruled that the valuation date was the date of the trial (as Ms. Friend advocated) that the value of Northshore was $1,000,000.00 (reflecting the accounts receivable) plus the amount of cash on hand as of August 9, 2001.

23. On September 17, 2001, Northshore filed its monthly operating report for August. The check registers attached to this report revealed that on August 8, 2001, one day prior to the valuation hearing, Dr. Provenza caused Northshore to issue checks totaling $456,980.90.[28] In one day, Northshore paid so-called "operating expenses" almost triple the historical monthly average operating expenses of $161,298.19.

24. At the November 2002 trial, Dr. Provenza either refused or was unable to produce invoices evidencing the legitimacy or purpose of many of these payments. His testimony suggesting that all payments to vendors were based on invoices was effectively impeached. Other August 8 payments to himself and attorneys were made in violation of this court's previous orders, or were unauthorized and prohibited by the Bankruptcy Code and Rules.

25. The court finds that Dr. Provenza caused these payments to be made with the intent to devalue Northshore and deprive Ms. Friend of her full interest in the value of the corporation.

26. Prior to the confirmation hearing, there was scheduled a hearing on Ms. Friend's motion to fix claim for purposes of debtor's third amended plan of reorganization (hereinafter referred to as the "motion to fix claim"), to be heard on October 24, 2001.[29] Ms. Friend's motion to fix claim compiled all of the parties' previous stipulations, and based on what she contended was the applicable arithmetic, concluded that her net community property claim, after all community debts were paid, and after taking into account the reimbursement and accounting claims of both sides, was $1,625,240.20.[30]

27. On October 23, 2001, the evening prior to the hearing on the motion to fix claim, Dr. Provenza filed a voluntary motion to convert his individual Chapter 11 case to Chapter 7,[31] rendering Provenza's plan, Ms. Friend's competing plan, and Ms. Friend's motion to fix claim all moot. Following Dr. Provenza's voluntary conversion of his personal Chapter 11 proceeding, the court ruled on the Northshore motions that it had previously taken under advisement, denying Northshore's motion to dismiss, denying Ms. Friend's motion to appoint a Chapter 11 trustee, but granting Ms. Friend's motion to convert Northshore to Chapter 7.[32]

27. Joint Ex. 307 and 308.

28. Joint Ex. 72.

29. Dr. Provenza's plan had called for him to pay Ms. Friend's allowed claim over five years with 9.5 percent interest. Ms. Friend contended, and the court agreed, that it would be necessary to determine her claim in order to determine, among other things, the feasibility of Dr. Provenza's Plan. See Joint Ex. 309, pp. 1 and 2.

30. Joint Ex. 309, pp. 2–5.

31. Joint Ex. 14.

32. Joint Ex. 8, Pl. 398. Northshore appealed the October 25, 2001 order converting its case to Chapter 7. See Joint Ex. 8, Pl. 404. This

### 3. The Chapter 7 cases and the November 2002 trial

28. Wilbur J. "Bill" Babin, Jr. ("Babin" or "the trustee") was appointed Chapter 7 trustee for both the Louis J. Provenza and Northshore cases, which continued to be under joint administration pursuant to this court's conversion order.[33] Babin proceeded to liquidate the assets of both estates.

#### a. Accounts Receivable and Other Debtors' Estate Funds

29. With one exception, Babin was quite successful in liquidating the majority of the Provenza estate's assets for full value. Babin's liquidation of Northshore's accounts receivable was less successful because Dr. Provenza repeatedly failed to comply with Babin's requests for information, failed to schedule the completion of his 341 meetings, and failed to account for funds with which he had been entrusted as the Chapter 11 debtor-in-possession.

30. The trustee hired Acadiana Computer Services ("ACS"), through its representative Jeff Richard, to liquidate Northshore's accounts receivable. ACS was unable to obtain the medical records, that should have been routinely provided by Dr. Provenza's staff, but were not. Thus, the proper documentation could not be furnished to the insurance provider causing many of the claims that should have been collected to be rejected.

31. The trustee also testified that he discovered, through an intercept order with the United States Post Office, an undisclosed account in Dr. Provenza's individual name, in the Parish National Bank account having a balance as of the date of conversion in the amount of $82,307.92.[34] This account was opened on or about October 1, 2001, after Northshore had filed its motion to dismiss its' Chapter 11 proceeding. The trustee determined that the account represented fees earned by Northshore. This account was not disclosed in any operating report nor in post-conversion reports mandated by this court in its conversion orders [35] each of which required the debtors to file, *inter alia*, a financial statement showing its operations during the Chapter 11 proceeding.

32. Dr. Provenza's only explanation at trial for this secret account was that his attorney had opened this account.[36] The court finds this explanation to be unacceptable.[37] Further, Dr. Provenza did not plead the affirmative defense of reliance on counsel. Dr. Provenza has argued that this money constitutes his separate income to which Ms. Friend has no claims, but the court finds that this money constitutes accounts receivable owned by the Northshore estate.

33. The court finds that Dr. Provenza intentionally concealed this property of the Northshore estate in an attempt to keep the funds for himself or the benefit of his post-conversion medical practice.

---

appeal was dismissed by the district court on February 28, 2002, due to Northshore's failure to file its designation and statement of issues. See Joint Ex. 8, Pl. 482.

**33.** Joint Ex. 8 and 27; Pls. 397, 398, and 399.

**34.** Joint Ex. 74.

**35.** Joint Ex. 27.

**36.** Tr. Tran., November 19, 2002, p. 62.

**37.** Numerous times during Dr. Provenza's testimony, he blamed his actions or lack of knowledge on his counsel. By the time of the November 2002 trial, Dr. Provenza was on his third set of attorneys; neither of the first two attorneys were present at the trial or had been deposed, thus making it facile, at least in Dr. Provenza's opinion, to say that many improper acts were those of the attorney rather than the debtor-in possession, Dr. Provenza, who owed the fiduciary duty.

34. Following conversion to Chapter 7, a § 341 meeting of creditors was scheduled for November 29, 2001.[38] The 341 meeting ultimately concluded on October 2, 2002, but only after Dr. Provenza had repeatedly delayed rescheduling of the meeting and the trustee had to file a motion to compel to obtain his attendance.[39] The court finds this to be part of Dr. Provenza's pattern of evasiveness and deception.

35. On March 28, 2002, the trustee wrote Dr. Provenza's counsel, seeking information concerning, among other things, an account that had been listed on Dr. Provenza's original bankruptcy schedules.[40] Dr. Provenza had stated at the November 29, 2001 § 341 meeting that there was a cashier's check from Edward Jones that had never been cashed. At trial, the trustee testified that he never received a written response to his March 28, 2002 request of Dr. Provenza's counsel, nor had the cashier's check been turned over to him.[41] Dr. Provenza's attorney turned the check over to the trustee the day before the November 2002 trial commenced. The court finds this to be a part of Dr. Provenza's pattern of evasiveness and deception. The court finds that similar failures occurred concerning various bank accounts at Hibernia, Whitney, and Bank One that should have been deposited into debtor-in-possession accounts, but were not.[42]

36. The court finds that Dr. Provenza had $74,566.38 in funds deposited in pre-petition bank accounts which were characterized in the operating reports as either "deposits in transit" or "checks held by debtor," [43] and not specifically designated as debtor-in-possession accounts, or deposited in debtor-in-possession accounts.

37. Dr. Provenza's closing of the Edward Jones' account, as well as the other pre-petition accounts at Hibernia, Whitney, and Bank One,[44] and his failure to deposit the funds from these accounts into a debtor-in-possession account, were willful and knowing misappropriations and conversion of property of the bankruptcy estate.[45] The court also finds that they were part of Dr. Provenza's pattern of deception and evasion in which he has engaged throughout the proceedings.

38. Operating Guidelines issued by the U.S. Trustee's office set forth the obligations and duties of a debtor in possession. The court finds that Dr. Provenza did sign Attachment II to the Operating Guidelines, acknowledging that he read and understood their requirements. The court further finds that he violated those

38. Joint Ex. 8, Pl. 402.

39. Joint Ex. 8, Pls. 817 and 832.

40. Joint Ex. 182.

41. Tr. Tran., November 19, 2002, pp. 158–162.

42. Joint Exs. 29 and 30, bank statements contained therein; Joint Ex. 11, Schedule B.

43. Tr. Tran., November 19, 2002, Testimony of Bill Babin, pp. 163–167.

44. The remaining $23,969.33 on deposit in pre-petition accounts which were closed by Dr. Provenza and never deposited in a debtor-in-possession account, have never been accounted for or explained, except that the trustee has agreed not to pursue those funds as part of his global settlement with Dr. Provenza. Neither this settlement whereby the trustee agrees not to pursue the funds, nor Dr. Provenza's position that Ms. Friend has no claim to these funds, removed or satisfied the obligation of Dr. Provenza as debtor-in-possession to account for these funds.

45. Dr. Provenza's counsel delivered $50,597.05 to the trustee from her escrow account on November 19, 2002, the second day of trial, as part of a global settlement with the trustee.

guidelines by failing to deposit pre-petition funds in debtor-in-possession accounts, and instead converting them to his own private use, for which no credible accounting was made.

### b. Northshore

39. The court finds that Northshore was a community asset. According to the corporation's tax returns, Northshore was incorporated on January 1, 1996, which was during the marriage of Dr. Provenza and Ms. Friend. Although consolidated administratively with the Provenza estate, Northshore continued to operate independently as debtor-in-possession, and filed its own monthly operating reports with the office of the United States Trustee and the bankruptcy court.

40. Although Northshore employed an office manager (Judy Anderson, who was also Dr. Provenza's personal secretary),[46] Dr. Provenza personally signed each and every check disbursing Northshore funds.[47] Dr. Provenza personally would decide whom to pay and how much to pay.[48]

41. Each month during the debtor-in-possession period, Judy Anderson would generate a check register report from QuickBooks and send it to the estate's CPA, Jack Swetland.[49] Mr. Swetland would use the QuickBooks check register report and the monthly bank statements to prepare the monthly operating reports that were to be filed.[50]

42. Mr. Swetland did not review, nor was he provided, invoices on which Northshore's expenditures were based. Swetland testified that, in preparing the operating report, he relied entirely on the expense categorizations found on the check register reports created and provided by Judy Anderson.[51] Each monthly operating report was approved and signed by Dr. Provenza on behalf of Northshore prior to filing.[52]

### (i). Dr. Provenza's Weekly Salary

43. On June 2, 2000, pursuant to Northshore's motion, this court authorized Northshore to pay Dr. Provenza compensation in the amount of $15,000.00 per week, plus reimbursement of out-of-pocket expenses.[53] For the first few weeks of the debtor-in-possession period, Northshore paid Dr. Provenza checks in the net amount of $15,000.00.[54] Beginning with Dr. Provenza's paycheck dated July 7, 2000, Northshore's weekly paycheck to him was for an amount less than $15,000.00, with the difference presumably withheld for taxes.[55]

44. According to evidence put forth by Ms. Friend, the total excess compensation paid to Dr. Provenza by Northshore was $121,000.00. Dr. Provenza's only attempt

---

46. Tr. Tran., November 26, 2002, p. 13.

47. *Id.* at 15.

48. *Id.* at 19–20.

49. *Id.* at 22.

50. Tr. Tran. January 30, 2003, pp. 100–101.

51. *Id.* at 105.

52. Joint Exs. 55 through 73.

53. Joint Pre–Trial Order, Statement of Uncontested Facts No. 18.

54. Joint Exs. 54–78. Dr. Provenza appears to have paid himself this amount even before the court authorized compensation, but Ms. Friend did not object to this payment and, therefore the court merely notes such payments as further evidence of Dr. Provenza's cavalier treatment of Northshore's funds as his personal piggy bank. *See* Joint Ex. 255 p. 12.

55. Joint Ex. 79, p. 27. Joint Ex. 79 is a summary admitted under FRE 1006, derived from Exhibits 55 through 78.

at trial to refute Ms. Friend's expert Harold Asher's [56] calculation was his testimony that the $15,000.00 weekly compensation authorized by the court was a net amount after taxes.[57] The order authorizing the compensation does not state whether the compensation was net or gross. The court finds Dr. Provenza's testimony that his interpretation of the order was that he was to receive $15,000 net compensation to be entirely disingenuous and without merit.[58] The court agrees with Mr. Asher's conclusion, and further, finds that Dr. Provenza's causing Northshore to overcompensate him is both an indicator of fraud, a knowing conversion of property of the estate, and part of his pattern of evasion and deception.

*(ii). Dr. Provenza's Personal Expenses*

45. Dr. Provenza caused Northshore to pay his personal expenses in addition to payments directly to him, while claiming these personal expenses to be operating expenses of the business. The court finds that the following Northshore disbursements were not legitimate business expenses of Northshore, yet were paid by Northshore at Dr. Provenza's express direction as a part of his pattern of evasiveness and deception.[59]

46. At the outset of the Chapter 11 cases, the court approved attorney Phillip K. Wallace to represent Dr. Provenza's individual bankruptcy estate,[60] attorney Warren G. Lott to represent the estate of Northshore,[61] and Jack Swetland, CPA, to provide accounting services to both estates.[62]

47. Between May 22, 2000 and August 24, 2001 Dr. Provenza caused Northshore to write seventeen checks to Phillip K. Wallace, totaling $137,287.55, for Dr. Provenza's personal benefit.[63] Dr. Provenza caused Northshore to make an unauthorized payment to Warren Lott in the amount of $5,000.00 on August 8, 2001.[64] Although Warren Lott was Northshore's attorney, the court had not authorized any interim compensation for Lott.[65] The court finds this to be part of Dr. Provenza's

---

56. Harold Asher, Ms. Friend's expert, was qualified as a Certified Public Accountant, Certified Valuation Analyst, and Certified Fraud Examiner. In addition to preparing several reports entered into evidence by Ms. Friend, he also testified as to the contents of those reports and his expert opinion as to their meaning and the meaning of Dr. Provenza's actions. Dr. Provenza's argument that Mr. Asher is not qualified to be an expert and that his reports did not have a proper foundation, will be discussed later in the opinion.

57. Tr. Tran., November 5, 2002, Testimony of Louis Provenza, pp. 87–88.

58. The court notes that if the $15,000.00 per week compensation was a net figure, then his gross compensation would be approximately $25,000.00 per week. Notwithstanding Dr. Provenza's testimony suggesting to the contrary, Dr. Provenza failed to identify any time in his career when he earned this level of income.

59. This finding is applicable to all payments and disbursements described in Finding of Fact paragraphs 46–60.

60. Joint Ex. 92. Mr. Wallace was the first of the three sets of attorneys representing Dr. Provenza.

61. Joint Ex. 93.

62. Joint Ex. 8, Pl. 16, Joint Ex. 18, Pl. 12.

63. Joint Ex. 79, pp. 34–36, summarizing disbursement records found in Joint Exs. 55 through 78; see also, Joint Ex. 194, Schedule 2.

64. Joint Ex. 79, p. 47.

65. This payment was made on August 8, 2001, the date on which Dr. Provenza made hundreds of thousands of dollars of unauthorized and/or out of the ordinary course of business payments in order to decrease Ms. Friend's equity in the corporation.

pattern of dealing with funds of Northshore without restraints or reporting and with complete disregard of the duties he owed as a debtor-in-possession.

48. Dr. Provenza caused Northshore to make unauthorized payments to Jack Swetland totaling $15,799.26.

49. Dr. Provenza also caused Northshore to pay the attorney fees of Jacques Bezou, with four checks issued to Bezou (or Bezou & Matthews) totaling $8,782.00.[66] Bezou was appointed as "special counsel" for a specified purpose having nothing to do with Northshore.[67] Northshore's payments to Bezou and Bezou & Matthews were unauthorized by this court and benefitted Dr. Provenza personally.

50. Northshore's monthly operating reports reveal payments of Dr. Provenza's personal debts to various credit card companies, including AAA Financial in the total amount of $6,823.44; First USA Bank in the total amount of $19,145.68; and MBNA in the total amount of $46,828.41.

51. Dr. Provenza admitted that these credit cards were not corporate credit cards.[68] Dr. Provenza stated at trial that he could not find any bills or invoices for these charges and admitted he did not call the credit company for copies.[69] Dr. Provenza produced no probative evidence whatsoever demonstrating the business purposes of Northshore's payments of his credit card bills.

52. The court finds that Northshore's payments to AAA Financial, First USA Bank, and MBNA, totaling $72,797.53, were not ordinary and necessary business expenses of Northshore, but rather were for Dr. Provenza's personal benefit. The court further finds that Dr. Provenza's use of Northshore funds for his personal benefit, above and beyond his court authorized compensation, was knowing and fraudulent. This finding applies to each instance of Dr. Provenza's use of Northshore funds for his personal benefit identified in this opinion.

53. Northshore's monthly operating reports reveal payments to Northwestern Mutual totaling $10,663.75.[70] Dr. Provenza's personal bankruptcy schedules listed Northwestern Mutual Life insurance policies as personal assets which Dr. Provenza claimed as exempt.[71]

54. The court finds that Northshore's payments to Northwestern Mutual were not ordinary and necessary business expenses of Northshore, but were payments benefitting Dr. Provenza personally.

55. On March 1, 2001, Dr. Provenza caused Northshore to issue a check to "Aerotech" in the amount of $4,000.00.[72] Dr. Provenza admitted that the purpose of this was to pay hangar rent for the MU–2 airplane in Texas where it was being stored.[73] Northshore did not own the airplane for which it paid this hangar rent. Bluevue Corporation, wholly owned and controlled by Dr. Provenza's individual estate, owned the airplane.

56. The court does not accept this stated purpose as being an ordinary and necessary expense of Northshore, rather this was a payment benefitting Dr. Provenza personally.

66. Joint Ex. 79, pp. 7 and 22.

67. Joint Ex. 106.

68. Tr. Tran., November 5, 2002, pp. 147–148.

69. Tr. Tran., November 5, 2002, p. 148.

70. Joint Ex. 79, p. 33.

71. Joint Ex. 11, Schedules B and C.

72. Joint Ex. 79, p. 4.

73. Tr. Tran., November 5, 2002, p. 155.

57. On December 30, 2000, Dr. Provenza caused Northshore to pay $4,342.56 to the "Tax Collector." [74] The court notes (and Dr. Provenza admitted) [75] that Northshore does not own any real estate and would have no direct obligation to pay real estate property taxes.

58. The court finds that this payment was not an ordinary and necessary business expense of Northshore.

59. Dr. Provenza failed to produce bills, statements, and/or invoices specifically requested by Ms. Friend in formal discovery concerning a host of disbursements, the purposes of which are not obvious from the identity of the payees. [76] Also, Mr. Asher identified numerous suspect disbursements by Northshore during the debtor-in-possession period, for which there is no documentation, [77] many of which have not been discussed above, including but not limited to payments to Frank Ricca (including a payment of $9,500.00 on August 8, 2001, the date of Dr. Provenza's spending spree).

60. The court finds that Dr. Provenza's and Northshore's failure to show documentation available to support their claim that these payments were for the benefit of Northshore, coupled with Dr. Provenza's proven use of Northshore funds to pay specified personal expenses, leads this court to find that these other payments were not ordinary and necessary expenses of Northshore, but rather were for the personal benefit of Dr. Provenza.

*(iii). The August 8, 2001 raid on the Northshore cash account.*

61. On August 8, 2001, Dr. Provenza caused Northshore to make the following payments of future expenses with the intent to reduce the corporation's cash for valuation purposes: [78]

One of the larger checks written on August 8, 2001 was to the Patients' Compensation Fund in the amount of $33,537.00. [79] This payment ostensibly was for an annual premium payable to the Louisiana Patients' Compensation Fund, a component of Dr. Provenza's professional liability coverage. [80] Dr. Provenza caused Northshore to make this August 8, 2001 payment to the Patients' Compensation Fund as a prepayment of the 2002 premium, which would not have been due or even invoiced until November 1, 2001. [81] The court finds that Northshore's August 8, 2001 payment to the Patients's Compensation Fund was not only made by Dr. Provenza in order to decrease Ms. Friend's equity in Northshore, but also constituted a prepayment of Dr. Provenza's 2002 premium, not yet invoiced or due, and for which he personally and directed benefitted.

62. On August 8, 2001, Dr. Provenza caused Northshore to issue two checks to Premier Computing Services, one for $6,000.00 and one for $36,000.00. Dr. Provenza and Judy Anderson gave conflicting testimony with regard to these

74. Joint Ex. 79, p. 43.

75. Tr. Tran., November 5, 2002, p. 154.

76. Joint Ex. 89.

77. Joint Ex. 194, Schedule 2.

78. The purpose of the valuation is set forth in F. of F. 22 and 26. This finding applies to all of the payments in paragraphs 61–67.

79. Joint Ex. 79, p. 35.

80. Tr. Tran., November 19, 2002, p. 40. Dr. Provenza testified that Northshore paid this amount because it had been invoiced by the Patients' Compensation Fund.

81. Tr. Tran., November 26, 2002, p. 69.

payments.[82] There is no invoice supporting the $6,000.00 payment of August 8, 2001. All previous invoices appear to have already been paid as shown from the payments reflected in Northshore's monthly operating reports.[83] The invoice for $36,000.00, dated August 1, 2001, appears to be for goods and services both previously rendered and to be rendered. The court also notes that the dollar amounts stated in the $36,000.00 invoice are in a type style different than that in all other invoices, suggesting that this invoice was manually generated, outside of Premier Computing's usual course of billing. This creates a suspicion in the court's mind that Premier Computing generated the invoice at someone's special request, to create a pretext for Dr. Provenza to pre-pay additional expenses.

63. The court finds that there is no evidence supporting the validity of Northshore's $6,000.00 payment to Premier Computing on August 8, 2001, and that Dr. Provenza caused Northshore to pay Premier Computing this $6,000.00.

64. The court further finds that the $36,000.00 payment issued to Premier Computing on August 8, 2001, was a prepayment,[84] improperly characterized as an operating expense.

65. Also on August 8, 2001, Dr. Provenza paid himself $40,000.00 out of Northshore's account,[85] and $46,000.00 to First Bank for payroll taxes.[86] The court notes

the suspiciously round number. On the same day, Dr. Provenza caused Northshore to pay R.W. Johnson $4,500.00, when payments to him in previous months were only $1,500.00.[87] Juana Pichon, who ordinarily was paid $500.00 per month, received both her regular $500.00 check on August 8, and also an additional check for $1,000.00 on that day.[88] HMO Louisiana, Inc. was paid $4,968.80 on August 8, triple its prior monthly payments of $1,656.60.[89] A company called "Executive" was paid $3,000.00 on August 8, more than any prior monthly payment.[90] On August 8, 2001, Northshore paid CLECO $1,800.00, a round number and an amount greater than any prior payment.[91] Likewise, on that day, Northshore sent BellSouth three checks of $1,500.00 each.[92] Northshore paid Alltel $2,700.00 on August 8, again, a round number and more than three times greater than any previous Alltel payment.[93]

66. Dr. Provenza could not produce invoices proving the existence of these bills, and his specific recollection concerning at least one of the prepayments (to the Patients' Compensation Fund) wherein he definitively had recalled the existence of an invoice, proved to be faulty. The court finds that Dr. Provenza caused Northshore to issue these pre-payments on August 8, 2001 with the intent of reducing Ms. Friend's equity in Northshore in light of the pending valuation hearing.

**82.** *Id.* at 27–30; Tr. Tran., November 19, 2002, pp. 38–39.

**83.** Exhibit 79, p. 37.

**84.** As a pre-payment, the monthly operating report should have disclosed the $36,000.00 as an asset.

**85.** Exhibit 79, p. 28.

**86.** *Id.* at 17.

**87.** *Id.* at 38.

**88.** *Id.* at 23.

**89.** *Id.* at 21.

**90.** *Id.* at 17.

**91.** *Id.* at 10.

**92.** *Id.* at 7.

**93.** *Id.* at 2.

67. The court finds that Dr. Provenza fraudulently mismanaged, diverted, and wasted the assets of Northshore, both during the debtor-in-possession period, and after conversion to Chapter 7.

### c. Other Corporations Owned/Managed by Dr. Provenza.

68. Dr. Provenza mismanaged other community assets—Lakeview Corporation, Bluevue Corporation, and R & P, L.L.C.

### (i). Lakeview Corporation

69. According to the corporation's income tax returns, the Lakeview Corporation, owned by Dr. Provenza individually, was incorporated on January 1, 1996—during the marriage of Dr. Provenza and Ms. Friend.[94] The court finds that the stock of Lakeview Corporation was a community asset.

70. The Lakeview Corporation owned the medical office building out of which Northshore operated. For the first nine months of the debtor-in-possession period, Northshore paid Lakeview Corporation just over $4,000.00 each month in rent. Lakeview would then pay its monthly note to Dr. Polizzi, its mortgage lender. By December, 2000, Dr. Polizzi was paid in full. From January through July, 2001, Northshore did not make any payments to Lakeview Corporation.[95] The operating reports do not reveal any unpaid rent or accruing accounts payable by Northshore for that period.[96]

71. On August 2, 2001, Dr. Provenza caused Northshore to pay Lakeview Corporation $45,000.00.[97] On August 8, 2001, Dr. Provenza caused Northshore to issue another check to Lakeview Corporation in the amount of $20,000.00.[98] At trial, Dr. Provenza testified that the $45,000.00 payment by Northshore to Lakeview was deposited into Lakeview's account, and Lakeview then paid Dr. Provenza $45,000.00. Dr. Provenza testified that whatever money came into the Lakeview Corporation was to be distributed to him. He also testified that he felt he was due a "management fee."[99] The court finds that Dr. Provenza's causing Lakeview to pay himself $45,000.00 was an unauthorized and fraudulent distribution, for no consideration, for Dr. Provenza's benefit and to the detriment of the community co-owner, Ms. Friend.

### (ii). Bluevue Corporation

72. According to the corporation's income tax returns the Bluevue Corporation, owned by Dr. Provenza, was incorporated on January 1, 1989 during the marriage of Dr. Provenza and Ms. Friend.[100] The court finds that the Bluevue Corporation was a community asset. Per Bluevue's income tax returns, the corporation owned a note payable from MPH in the amount of $76,500.00.[101] MPH is an entity affiliated with one Hudson Holiday, a man with whom Dr. Provenza has had other busi-

---

94. Joint Exs. 231, 232, and 233.

95. Joint Ex. 79, p. 25; Tr. Tran., November 19, 2002, p. 32.

96. Joint Exs. 65–71.

97. Joint Ex. 79, p. 25.

98. *Id.*

99. Tr. Tran., November 19, 2002, p. 33. In fact, Dr. Provenza testified at trial that he

redeposited the $45,000.00 back into Northshore, along with the $40,000.00 he had taken from Northshore on August 8, and the $22,000.00 he had taken from Bluevue Corporation on August 3, 2001, ostensibly in order to reimburse Northshore for its having paid his personal attorney's fees. See Tr. Tran., January 29, 2003, pp. 87–91.

100. Joint Exs. 240, 241, and 242.

101. *See* Schedules L and accompanying statements; Joint Exs. 240, 241, and 242.

ness relations. Bluevue's Schedule K–1 for 1998 indicated Dr. Provenza held a 25% interest in the entity.[102] Dr. Provenza offered no explanation as to why Bluevue, a corporation which he operated and controlled, did not collect the note payable from MPH, nor did he refute that MPH had, in fact, owed Bluevue $76,500.00. The court finds that Dr. Provenza's failure to enforce the MPH obligation on behalf of Bluevue Corporation constitutes mismanagement of Bluevue Corporation and resulted in damage to the corporation of $76,500.00.

73. Dr. Provenza also admitted at trial that on August 3, 2001, he caused Bluevue to issue to himself a check for $22,000.00,[103] money which he in turn deposited into Northshore's account for the ostensible purpose of reimbursing Northshore for its having paid Dr. Provenza's personal attorney's fees.[104] Dr. Provenza offered no other explanation for the $22,000.00 distribution to himself from Bluevue Corporation.

74. The court finds that Dr. Provenza's causing Bluevue to pay himself $22,000.00 was an unauthorized distribution for no consideration, for Dr. Provenza's benefit, and to the detriment of the corporation and the community co-owner, Ms. Friend.

### (iii). R & P, L.L.C.

75. R & P, L.L.C. is a business venture in which both Dr. Provenza and Frank Ricca are members.[105] According to its tax return,[106] it was formed on March 1, 1995, during the marriage. The court finds that Dr. Provenza's interest in R & P, L.L.C. was actually an interest owned by the parties' community of acquets and gains. The Schedule K–1 attached to the 1999 tax return indicates that Dr. Provenza's interest in the entity for purposes of profit sharing, loss sharing, and ownership of capital is 95%.[107] Likewise, the K–1 for Frank Ricca, also attached to the return, shows that Frank Ricca's interest is 5% for the same purposes.[108] This same ownership information is reflected in the K–1 attached to the 1998 return for R & P, L.L.C.[109] The capital accounts shown on the K–1s for Provenza and Ricca reflect the same ratios, indicating Provenza's 95% membership interest, and Ricca's 5% membership interest. Dr. Provenza took full advantage of this ordinary loss, deducting the full amount of $36,109.00 allocated by the R & P K–1, as a nonpassive loss in 1998.[110] The K–1 ordinary loss was also used by Dr. Provenza in his 1999 return.

**102.** Joint Ex. 248. The trustee, Bill Babin, testified that he looked into the payable from MPH, was informed by Dr. Provenza's counsel that it was no longer enforceable, and did not pursue collection. The trustee subsequently sold Bluevue to Dr. Provenza for $11,000.00, the value of its hard asset—the aircraft owned by Bluevue. Tr. Tran., November 21, 2002, p. 99.

**103.** See Joint Ex. 256, entries dated August 3, 2001, p. 3. Although the entry categories this payment as "rent," Bluevue did not have any rental agreement with Dr. Provenza, nor is such an agreement disclosed in any bankruptcy schedule or report.

**104.** Tr. Tran., January 29, 2003, p. 90–94.

**105.** Tr. Tran., November 19, 2002, Testimony of Louis Provenza, pp. 39–40.

**106.** Joint Ex. 244.

**107.** *Id.*

**108.** *Id.*

**109.** Joint Ex. 243.

**110.** Joint Ex. 225, Schedule E, Statement 7, 28th page of exhibit. Dr. Provenza's income tax returns, for which there is no question as to authenticity, and which have been admitted into evidence, are unsigned. These returns were provided by Dr. Provenza to Ms. Friend pursuant to formal discovery requests, requesting production of the returns. Although

76. Dr. Provenza's amended bankruptcy schedules disclose his ownership interest in R & P, L.L.C. as a 25% interest, worth $10,000.00. Dr. Provenza testified that he instructed his accountant, Jack Swetland, to make those changes in the tax returns, contending that the prior years' returns were in error.[111] Dr. Provenza did not identify any documents that demonstrated that the 1998 and 1999 K–1s were in error. Additionally, Dr. Provenza failed to deny that those returns were actually filed or that he amended the tax returns for those years when the "mistakes" were ostensibly discovered and corrected in 2000 or 2001 when the year 2000 income tax return was filed.[112]

77. The court finds that Dr. Provenza's interest in R & P was a 95% interest, as indicated by the 1998 and 1999 income tax returns, and not a twenty-five percent interest as claimed by Dr. Provenza, that Dr. Provenza's transfer of 70% of the ownership of R & P to Ricca was for no consideration and was subject to avoidance either as a pre-petition fraudulent conveyance under § 548 of the Bankruptcy Code, or a post-petition transfer avoidable under § 549 of the Bankruptcy Code. Whichever the case may be, the trustee apparently released the estate's avoidance claims in his global settlement with Dr. Provenza, and by selling the estate's interest in R & P to Dr. Provenza in January, 2003. The court finds that Dr. Provenza's transfer of 70% of his interest in R & P to Ricca, for no consideration, constituted fraudulent mismanagement of community assets. Accordingly, the court finds that the 70% interest transferred to Ricca was worth $28,000.00, a proportionate amount. The court finds this transfer without consideration to be part of Dr. Provenza's pattern of evasiveness and deception.

#### d. Dr. Provenza's Income Tax Liabilities

78. Harold Asher testified that Dr. Provenza's failure to pay federal income taxes for the years 1997 and 1998, and state income taxes for the years 1995 through 1998, resulted in damage to the community in the form of penalties and interest owed by the community. Asher's rationale was that "for those years Dr. Provenza knew that he was not making proper payments and continued to presumably, knowingly, and willfully divert his funds from his income tax payments to other purposes."[113] Asher's analysis and calculation, concluding that these penalties and interest attributable to the community tax liability totaled $71,857.00, is explained in his testimony and found at Schedule 13 of his report and updated reports.

79. Dr. Provenza is an unrepentant late filer and under payer of income taxes. He filed his Chapter 11 ostensibly for the purpose of reorganizing his $833,000.00 pre-petition tax liability. His 1999 income tax return, filed after the bankruptcy petition was filed, showed an unpaid federal tax liability of $161,315.00.[114] His year 2000 federal income tax return shows total unpaid taxes of $112,553.00, and there is also $16,767.00 due to the state.[115] As of January 30, 2003, he had not filed his 2001 income tax returns because he had yet to provide to his accountant the necessary

these returns are unsigned, the court finds that these income tax returns are the returns of Dr. Provenza.

111. Tr. Tran., November 5, 2002, p. 58.

112. Tr. Tran., November 5, 2002, pp. 56–62.

113. Tr. Tran., November 26, 2002, pp. 145.

114. Joint Ex. 226.

115. Joint Ex. 227.

information.[116] For the year 2002, Dr. Provenza testified that his compensation was not subject to withholding, and that he had paid no estimated taxes. Thus, the court finds that Dr. Provenza's stated intention for filing for Chapter 11 bankruptcy protection for purposes of paying off his tax liabilities was disingenuous.

80. The court finds Asher's methodology and calculations in determining Ms. Friend's fraud and mismanagement claim with respect to Dr. Provenza's non-payment of community taxes to be reasonable. There is no evidence in the record contradicting his calculation, nor was there an expert report opposing it. Accordingly, the court finds that Dr. Provenza's non-payment of community taxes constitutes mismanagement of community property, breach of duty, and caused damage to the community in the amount of $71,857.00.

### e. Dr. Provenza's Level of Control and Financial Sophistication

81. At various times during the trial, Dr. Provenza professed to be unaware of the financial details of his medical practice and his various business ventures and investments, suggesting that he practiced medicine and left those matters in the hands of his staff and the people he hired.[117] The court finds, however, that Dr. Provenza is financially sophisticated enough to understand his financial affairs and was in complete control of his financial affairs, having greater knowledge of the nature of his transactions than his accountant. Dr. Provenza's various ventures portray an impressive array of business activities, ranging from the operation of an aircraft hangar and maintenance facility (L & P Leasing and Delta Aviation), a real

estate holding company (Lakeview Corporation), an aircraft company turned medical parts reseller (Bluevue Corporation), and a junkyard (R & P, L.L.C.), not to mention his professional medical corporation (Northshore).[118] In addition, Dr. Provenza invested in various beachfront condominiums, vacant lots, and other valuable real estate investment property.

82. Dr. Provenza was the decision maker with respect to all of these properties and ventures. There is no evidence that anyone other than Dr. Provenza ran these businesses. The court finds that Dr. Provenza was financially sophisticated and an active manager of the businesses of which he was a part or whole owner.

### f. Liquidated Community Property

83. Ms. Friend claims entitlement to a one-half undivided interest in the non-exempt community property of Dr. Provenza's bankruptcy estate, all of which has now been liquidated by the trustee who holds the proceeds. The court is cognizant that Ms. Friend's community property claims relate to both the community property proceeds held by the bankruptcy estate, as well as other community property, mainly exempt assets, held by Dr. Provenza. Although the court has taken evidence and will rule with respect to both, these components will be addressed separately, inasmuch as Ms. Friend's claim with respect to community assets held by the bankruptcy estate must be identified and calculated separately in order to assure a correct distribution from the estate.

84. The trustee has liquidated virtually all of the non-exempt community and/or jointly held property of Ms. Friend and Dr. Provenza.[119] These community and/or

---

116. Tr. Tran., January 30, 2003, p. 104.

117. *See, e.g.,* Tr. Tran., November 19, 2002, p. 34.

118. Exhibit Friend 24, Schedule 12.

119. There is an issue still pending on appeal in the Fifth Circuit as to whether three jointly owned and titled pieces of real estate located in Florida and Mississippi were community property, or co-owned non-community prop-

jointly owned properties were liquidated as follows:

*Southwinds.* This property, a condo in Destin Florida, was acquired on or about March 31, 1997, and was a community asset of the estate. On February 27, 2002, the trustee sold the Southwinds property for $671,000.00, with a net cash amount realized by the estate (after payment of the mortgage lender Homecomings Financial Network and other costs) of $311,915.62.[120]

*Beachside.* This property, another condo in Destin, Florida, was acquired on or about September 28, 1990, and was a community asset of the estate. On April 17, 2002, the trustee sold the Beachside property for $350,000.00, with a net cash amount realized by the estate (after payment of the mortgage lender Countrywide Home Loans, Inc. and other costs) of $244,317.50.[121]

*Gause Blvd.* This property, a lot located on Gause Blvd., in Slidell, Louisiana, was acquired on or about June 25, 1993, and was a community asset of the estate. On April 24, 2002, the trustee sold the Gause Blvd. property for $510,000.00. The proceeds of this sale were paid to the first mortgage lender Bank Midwest in the amount of $85,816.19, and to the second mortgage holder Bank One which had cross-collateralized collateral mortgages on this and on other properties securing community indebtedness in the amount of $422,793.81. The remaining funds were used to eliminate seller's closing costs, so there was no net to the estate.[122]

*Lot 16, Lacombe Harbor.* The property referred to as Lot 16, Lacombe Harbor, Lacombe, Louisiana was acquired during the marriage of the Dr. Provenza and Ms. Friend and was a community asset of the estate. On April 24, 2002, the trustee sold Lot 16 for $90,000.00. Bank One held a mortgage on this property which had arguably prescribed and was not reinscribed within the allowable 4 month period. The trustee reached a compromise settlement in which Bank One was paid one-half of the realized price after all seller's costs. The estate realized net cash funds in the amount of $44,405.00.[123]

*Lot 13, Lacombe Harbor.* The property referred to as Lot 13, Lacombe Harbor, Lacombe, Louisiana, was acquired during the marriage of the debtor and Ms. Friend and was a community asset of the estate. On April 24, 2002, the trustee sold the Lot 13 property for $116,000.00. The proceeds of this sale were paid to Bank One which had cross-collateralized collateral mortgages on this and on other properties securing community indebtedness in the amount of $114,800.00. The remaining funds were distributed to pay seller's closing costs. The estate received no net funds.[124]

*Lots 14 and 15, Lacombe Harbor.* This property, two lots in Lacombe Harbor, Lacombe, Louisiana, was acquired on or about September 22, 1988, and was a community asset. On August 7, 2002, the trustee sold the Lots 14 and 15 property for $313,800.00, with a net cash amount realized by the estate (after payment of

erty. This court ruled that these properties were community property. On appeal, the district court reversed, ruling that the properties were not community property. The case is now in the Fifth Circuit, which has issued a "stay" of the district court's decision.

120. Joint Pre–Trial Order, Statement of Uncontested Facts Nos. 44 and 45.

121. Joint Pre–Trial Order, Statement of Uncontested Facts Nos. 46 and 47.

122. *Id.* at 52 and 53.

123. *Id.* at 54 and 55.

124. *Id* at 56 and 57.

mortgage lender Homeside Lending and St. Tammany Homestead and other costs) of $116,584.10.

Dr. Provenza received the $25,000.00 homestead exemption, when he purchased Lots 14 and 15 (and the improvements thereon) at Lacombe Harbor, from the trustee on August 7, 2002, as he was allowed to pay a reduced purchase price based on a credit he was given for having the benefit of the homestead exemption allowed by the court.[125]

***Fish Hatchery Road.*** This property on Fish Hatchery Road, Lacombe, Louisiana was acquired during the marriage of Dr. Provenza and Ms. Friend and was a community asset of the estate. On August 7, 2002, the trustee sold the Fish Hatchery Property for $354,267.38. The estate realized no net proceeds because a mortgage was held by Standard Mortgage for $349,267.38 which was paid in full and Bank One held a cross-collateralized collateral mortgage on this property to secure community indebtedness and was paid the remaining $5,000.00 from the sale.[126]

***1001 Florida Avenue.*** This property, the medical office building located at 1001 Florida Avenue, Slidell, Louisiana, was acquired and owned by Lakeview Properties, Inc., a corporation, which came into existence on or about January 1, 1996. The stock of Lakeview Properties, Inc. is community property of the estate. On August 28, 2002, the trustee sold 1001 Florida Avenue, for $249,100.00 with a net cash amount, less seller's costs, realized by the estate in the amount of $237,164.54.[127]

***Caribe.*** This property, Lot 33 in the Caribe Subdivision, in Destin, Florida, was acquired on or about May 22, 1992. Both Louis J. Provenza's and Louanne Friend's names were on the title. This court determined that this property was community property. On December 12, 2002, the district court reversed this court's decision, and ruled that the property was not community property, but rather, that Louis J. Provenza and Louanne Friend each had a one-half undivided interest in the property. As such, Ms. Friend's one-half undivided interest in this property is not property of the estate, and she has a one-half undivided interest in the net proceeds.[128] Louis J. Provenza has appealed the district court's ruling to the Fifth Circuit, and that appeal is now pending. In the meantime, the district court's ruling is stayed.[129]

On April 17, 2002, the trustee sold the Caribe property for $855,000.00, with a net cash amount realized by the estate of $837,782.29. Pursuant to this court's order, one-half of these funds, or $418,891.14, is presently being held by the trustee in escrow, where these funds shall remain pending final disposition of the appeal to the Fifth Circuit.[130]

***Troon.*** This property, a lot on Troon Drive, in Destin, Florida, was acquired on or about October 28, 1991. Both Louis J. Provenza's and Louanne Friend's names were on the title. This court determined that this property was community property. On December 12, 2002, the district court reversed this court's decision, and ruled that the property was not community property, but rather, that Louis J. Provenza and Louanne Friend each had a one-half undivided interest in the property. As such, Ms. Friend's one-half undivided

125. *Id.* at 72.

126. *Id.* at 61 and 62.

127. *Id.* at 63 and 65.

128. Exhibits Friend 16, 17, and 18.

129. Exhibit Provenza 2.

130. Joint Pre–Trial Order, Statement of Uncontested Facts Nos. 42 and 43.

interest in this property is not property of the estate, and she has a one-half undivided interest in the net proceeds.[131] Louis J. Provenza has appealed the district court's ruling to the Fifth Circuit, and that appeal is now pending. In the meantime, the district court's ruling is stayed.[132]

On February 27, 2002, the trustee sold the Troon property for $94,000.00, with a net cash amount realized by the estate (after payment of the mortgage lender, First National Bank & Trust and other costs) of $47,477.63. Pursuant to this court's order, one-half of these funds, or $23,738.82, is presently being held by the trustee in escrow, where these funds shall remain pending final disposition of the district court's order now pending on appeal in the Fifth Circuit.[133]

*Jesse Wells Road.* This property, on Jesse Wells Road, in Poplarville, Mississippi, was acquired on or about January 20, 1994. Both Louis J. Provenza's and Louanne Friend's names were on the title. This court determined that this property was community property. On December 12, 2002, the district court reversed this court's decision, and ruled that the property was not community property, but rather, that Louis J. Provenza and Louanne Friend each had a one-half undivided interest in the property. As such, Ms. Friend's one-half undivided interest in this property is not property of the estate, and she has a one-half undivided interest in the net proceeds.[134] Louis J. Provenza has appealed the district court's ruling to the

Fifth Circuit, and that appeal is now pending. In the meantime, the district court's ruling is stayed.[135]

On August 7, 2002, the trustee sold the Jesse Wells Road property for $340,720.00, with a net cash amount realized by the estate (after payment of mortgage lender, Hancock Bank and other costs) of $244,507.58. Pursuant to this court's order, one-half of these funds, or $122,253.79, is presently being held by the trustee in escrow, where these funds shall remain pending final disposition of the district court's order now pending on appeal in the Fifth Circuit.[136]

85. From the sales of real estate described above in the total amount of $3,943,887.38, the trustee collected $2,082,581.38, net of all mortgages, liens, taxes, and closing costs.[137] Dr. Provenza purchased all of the properties from the estate except Jeannette and Avant Garde which were separate properties belonging only to Dr. Provenza's personal estate.

86. On or about January 3, 2003, Babin sold various movable properties to Louis J. Provenza for a total of $202,700.00.[138] The property subject to this sale included the stock of R & P, LLC, Delta Aviation, Bluevue Corporation, L & P Leasing, and other movable assets including the MU2 airplane. The court finds that all of the items sold were community property with the exception of the Hunter sailboat. Dr. Provenza offered no probative evidence to rebut the classification of the movables as

---

131. Exhibits Friend 16, 17, and 18.

132. Exhibit Provenza 2.

133. Joint Pre–Trial Order, Statement of Uncontested Facts Nos. 48 and 49.

134. Exhibits Friend 16, 17, and 18.

135. Exhibit Provenza 2.

136. Joint Pre–Trial Order, Statement of Uncontested Facts Nos. 50 and 51.

137. *See* Exhibit Friend 24, January 8, 2003 Report of Harold Asher, Schedule 1, which summarizes the gross sales and computes the net proceeds to the estate from these sales.

138. Tr. Tran. January 28, 2003, Testimony of Bill Babin, page 57–58.

community property. The court notes that when Dr. Provenza purchased the movables from the trustee, the trustee's motion for approval of that sale apportioned $3,000.00 for the Hunter sailboat.[139] Accordingly, the court finds that the community non-exempt movables sold for a total of $199,700.00 ($202,700.00 minus $3,000.00).

87. As stated earlier, the trustee collected $60,000.00 from the rental of the medical office building located at 1001 Florida Avenue in Slidell, Louisiana.[140] These proceeds are community property.

88. The court recognizes that the interest earned by the trustee on deposits, estimated by the trustee at $95,000, is a part of the community property sales proceeds.

89. Accordingly, the court finds that the total proceeds derived from the trustee's liquidation of community and/or jointly owned assets is $2,357,281.38, computed as follows:

| | |
|---|---|
| Community and/or jointly owned real estate | $2,082,581.38 |
| Rental income | 60,000.00 |
| Interest received | 15,000.00 |
| Non-exempt movables | 199,700.00 |
| TOTAL: | $2,357,281.38 |

90. Before Ms. Friend can be awarded a one-half interest in the proceeds generated from the sales of community and jointly owned assets, community liabilities payable by the bankruptcy estate must be deducted. At trial, the trustee identified what he considered to be community liabilities.[141] Harold Asher also identified the community liabilities, and these are summarized in his report.[142] The court finds the allowed and/or allowable community debts, payable by the trustee out of the estate's cash generated from the sale of community assets, to be as follows:

| | |
|---|---|
| Anderson & Anderson: | $ 3,667.92 |
| Louisiana Department of Revenue (Income taxes 1995—Sept. 18, 1998, pro-rated for 1998): | 61,423.66 |
| Internal Revenue Service (Income taxes 1997—Sept. 18, 1998, pro-rated for 1998): | 258,162.33 |
| Colonial Acres lease: | 5,998.59 |
| Hibernia National Bank (L & P Leasing): | 11,106.23 |
| Hibernia National Bank (American Medical Leasing): | 44,163.27 |
| Hibernia National Bank (American Medical Leasing): | 45,566.39 |
| TOTAL:[143] | $ 430,088.39 |

91. In addition to paying community creditors, the trustee must pay the income taxes generated from the liquidation of the community assets. The only evidence offered concerning this was Harold Asher's expert testimony, referring to his calculations set forth in his report.[144] Dr. Provenza offered no countering evidence. Schedules 3, 4, 9, and 11 of Asher's report contained the details of his calculation. Asher reports that the taxable gain from the sale of real estate was $1,551,805.26. Other taxable income is the trustee's rent-

**139.** Exhibit Friend 13.

**140.** Joint Pre-Trial Order, Statement of Uncontested Facts No. 66.

**141.** Tr. Tran., November 21, 2002, pp. 39–50.

**142.** Exhibit Friend 24, Schedule 2.

**143.** The court notes that prior to trial, other community claims were on file. Many were claims of mortgage lenders that were paid in full when the collateral was sold. In addi-tion, during the time that the trial was conducted (over a period beginning November 5, 2002, and extending through January 30, 2003), the claim of Sears was disallowed, and the claim of Bank One was paid in full through Bank One's settlement with the Northshore estate and Dr. Rogers. Exhibits Friend 4, 12, and 20.

**144.** Tr. Tran., November 26, 2002, p. 112.

al income of $60,000.00 from the medical office building, and interest in the amount of $15,000.00. These income items are offset by the losses from sales of the non-exempt movables ($238,742.00),[145] interest expense borne by the estate ($32,724.51), and losses benefitting the bankruptcy estate due to its acquisition of tax attributes from community entities ($216,480.00). Finally, Asher estimated that the deductible administrative fees for the trustee, his counsel, and accountants, would be $200,000.00. All told, Asher calculated the taxable income from the generation of the community property sales proceeds to be $938,858.75. Asher then applied the federal income tax rate of 18% (applicable to capital gains), and the state income tax rate of 4.9% (applicable to capital gains), to calculate the taxes due by the community estate in the amount of $209,271.62.

92. The court finds Asher's methodology, assumptions, and calculations to be reasonable. There is no evidence in the record contradicting his calculation, nor was there an expert report opposing his analysis. Accordingly, the court finds that for purposes of determining Ms. Friend's claim, the community assets will be charged with taxes in the amount of $209,271.62.

### g. Administrative Expenses

93. Justice and fairness require that Ms. Friend's community portion be shielded from paying administrative expenses, based on the history of these bankruptcy proceedings. Although the court has made no finding as to whether Dr. Provenza filed the initial Chapter 11 petitions on behalf of himself and Northshore in good

faith, the inquiry does not end there with regard to the payment of administrative expenses. Dr. Provenza did file a series of false bankruptcy schedules, both omitting assets and substantially understating the values of those listed. He filed a series of reorganization plans, without much regard or concern as to whether or not they were feasible. His disclosure statements consistently understated the market value of his assets, and consistently misinformed unsecured creditors that they would receive nothing in a liquidation. He failed to deposit estate funds into debtor-in-possession accounts, and instead converted them to his own use. He opened a secret account to which he diverted Northshore's funds. He converted funds in Northshore's accounts to his own use. He blatantly disregarded this court's orders with respect to compensation of both himself and his professionals. Instead of reorganizing his substantial pre-petition tax debt, he incurred greater tax liability. Dr. Provenza's abuses of the bankruptcy court system, his and Northshore's creditors, and other parties in interest, has resulted in a huge expenditure of judicial and professional resources. The court rejects Dr. Provenza's argument and proposed findings of fact that administrative costs should be shared because Ms. Friend always approved every motion, notice or plan that Dr. Provenza filed.[146]

94. Ms. Friend has expended substantial resources in retaining counsel, obtaining appraisals, establishing Dr. Provenza's estate's true value, and throughout these proceedings has attempted to call to the attention of the court and the estate's

---

145. Friend Exhibit 24, Schedule 9.

146. According to Dr. Provenza's Post–Trial Memorandum, page 55, the docket sheet shows more than 200 oppositions, responses, notices and motions were filed by Ms. Friend. Even if that is true (the court has not gone

back over these pleadings) the court finds that these oppositions by Ms. Friend were necessary either to protect her own financial interest and/or to expose misdeeds of Dr. Provenza.

creditors, Dr. Provenza's abuses, the true value of the estate's assets, and that Dr. Provenza's plans to retain all estate assets, and simply pay creditors over time, was not feasible. The court considers Dr. Provenza's voluntary conversion to Chapter 7 as an admission that his Chapter 11 plans were not feasible. Thus his one and a half years as debtor-in-possession served to do nothing more than to deceive and delay his creditors, and his co-owner Ms. Friend.

95. Pursuant to 11 U.S.C. § 726(c)(1), the court is authorized to allocate administrative expenses between the bankruptcy estate's community assets and "other property of the estate" as the interest of justice requires. In this case, the court finds that "other property of the estate," namely, Dr. Provenza's separate assets, should bear the entirety of the bankruptcy estate's administrative expenses, except for the income taxes payable by the estate arising out of the liquidation of the community assets. This will result in Ms. Friend's receiving full value for her co-owned property and her share of the community surplus (the community funds remaining after community creditors and the estate's taxes arising out of the liquidation of the community assets), and will not prejudice any other creditor or party in interest, inasmuch as there are sufficient assets to pay their claims. Because Ms. Friend will receive one-half of the commu-nity surplus, and Dr. Provenza's separate bankruptcy estate will receive the other half, his separate estate will then have ample funds to pay creditors (other than Ms. Friend), as well as the administrative expenses. The magnitude of Dr. Provenza's potential recovery as the debtor of a solvent estate, after all claims and expenses are paid, will be diminished, but that is the price the interest of justice test of § 726(c)(1) requires that he pay for his conduct in these bankruptcy proceedings, particularly his mismanagement of the debtors in possession during the administration of the two Chapter 11's.

96. Accordingly, the $2,357,281.38 in funds collected by the trustee from the liquidation of community and/or jointly held assets, will be reduced by the $430,088.39 in monies due the unsecured creditors, and by $209,271.62 for taxes, leaving $1,717,921.37 in community and/or jointly held funds after payment of the unsecured creditors and the community taxes.[147]

### h. Funds due to Ms. Friend from the Chapter 7 Liquidation

97. As co-owner, Ms. Friend would be entitled to 50% of the remaining $1,717,921.37. Thus, she is entitled to receive $858,960.69 directly from the bankruptcy estate.[148] Ms. Friend has already received an interim distribution of $150,000.00 from the trustee. Accordingly, she is presently owed $708,960.69 from the

---

147. This calculation assumes that the Fifth Circuit will reverse the district court, and that the Caribe, Troon, and Jesse Wells Road properties will be deemed "community property." If the district court's decision is upheld by the Fifth Circuit, the net funds generated from the sales of these properties ($1,129,767.50) would be removed from the analysis altogether, thereby reducing the community property proceeds, and reducing the community income taxes.

148. This amount would be reduced by the accounting and reimbursement claims that Provenza may have against Ms. Friend for Provenza's use of his separate assets to pay the parties' community indebtedness and obligations. Those accounting and reimbursement claims would be offset by accounting and reimbursement claims that Ms. Friend has for her payment of community claims with her separate assets, as well as reimbursement and accounting claims for Dr. Provenza's use of community funds to pay his separate obligations.

trustee out of funds generated from community and jointly owned assets.

98. Ms. Friend claims recognition of and payment for her undivided one-half interest in community property now held by Dr. Provenza that was not administered by the trustee under Louisiana community property laws:

*(i). Household goods and miscellaneous*

Based on the testimony of Ms. Friend,[149] and the stipulations entered into by Dr. Provenza and Ms. Friend at trial,[150] the court finds that Dr. Provenza is in possession of $20,465.00 worth of exempt household goods and other miscellaneous movables that are community property.

*(ii). Life insurance policies and retirement account*

The community life insurance policies with Northwestern Mutual and Pan American Life had a total cash value as of the last reported dates prior to trial totaling $271,130.91.[151] Also, Ms. Friend had a retirement account with VALIC, having a value as of September 30, 1998 (the date the community terminated), including legal interest through November 26, 2002, in the amount of $2,798.51.

*(iii). The homestead exemption*

Dr. Provenza received the benefit of $25,000.00, representing the homestead exemption, when he purchased Lots 14 and 15 (and the improvements thereon) at Lacombe Harbor, from the trustee on August 7, 2002, because he paid a reduced purchase price based on a credit allowed for the homestead exemption.[152] Even though Dr. Provenza (who was living in the home) was the only person who could claim the homestead exemption, the underlying asset was community property, and the exempt portion of that community property did not lose its community status.

*(iv). Tax benefits from community tax losses taken by Dr. Provenza*

Finally, the community corporations and business entities generated losses which in turn generated tax benefits enjoyed by Dr. Provenza (in the form of reduced separate income tax liability), for 1999 and the portion of 1998 after the termination of the community, in the amount of $35,169.67.[153]

*(v). Total community assets outside the bankruptcy estate*

In toto the exempt and non-estate community assets, none of which were liquidated by the trustee, are as follows:

| | |
|---|---|
| Exempt movables: | $ 20,465.00 |
| Retirement—VALIC: | 2,798.51 |
| Life insurance policies: | 271,130.91 |
| Homestead exemption: | 25,000.00 |
| Tax benefits from other community entities: | 35,169.67 |
| 1992 Lexus sold by Louanne Friend: | 6,000.00 |
| TOTAL: | $ 360,564.09 |

Ms. Friend's share of this total is half, or $180,282.05. She has already received the cash from one of the life insurance policies, the cash from the sale of the Lexus, and she has retained her VALIC retirement fund. These amounts are as follows:

---

149. Tr. Tran., November 26, 2002, pp. 163–170.

150. Tr. Tran., November 21, 2002, pp. 106–107.

151. Stipulation entered November 26, 2002, Friend Exhibit 2. Dr. Provenza testified that he has now mortgaged these policies to se- cure loans to finance his post-petition acquisitions and obligations. Tr. Tran., January 28, 2003, p. 183.

152. Joint Pre–Trial Order, Statement of Uncontested Facts No. 72.

153. *See* updated report of Harold Asher, Friend Exhibit 24, Schedule A, Item I–B.

| | |
|---|---|
| Life insurance policy: | $ 9,964.73 |
| Lexus | 6,000.00 |
| Valic retirement fund: | 2,798.51 |
| **TOTAL:** | $ 18,763.24 |

Accordingly, subtracting the $18,763.24 in assets already received by Ms. Friend from her 50% interest totaling $180,282.05, leaves Dr. Provenza owing Ms. Friend $161,518.81 for equalizing payments with respect to community assets outside of the bankruptcy estate, which he has retained, consumed, and/or mortgaged.

### (vi). Reimbursement Claims

99. Ms. Friend seeks reimbursement and accounting for community cash in Dr. Provenza's use and control as of the termination of the community, and for the use of community funds and/or property to pay Dr. Provenza's separate obligations.

100. Through discovery, Ms. Friend was able to identify six community bank accounts in existence as of September 18, 1998, the date that the community terminated.[154] All of these accounts were in the name and/or control of Dr. Provenza, with statements going to his office address.[155] Asher's report, dated July 12, 2001,[156] calculates that the community cash taken by Dr. Provenza through the known community accounts, plus legal interest from September 30, 1998 through the date of trial [157] to be $145,221.96. Finding the report to be reasonable, and there being no probative evidence to the contrary, nor any contradictory report, the court finds that Dr. Provenza had use of and is accountable for $145,221.96 of community cash, including interest.

### (vii). Separate Assets

101. Prior to the marriage, Dr. Provenza owned the separate assets referred to as the Jeannette Street property, a double located in New Orleans, Louisiana, and the Avant Garde property, a condominium located in Kenner, Louisiana. During the community, Dr. Provenza used community funds to service and reduce the mortgages on these properties. These debts were separate obligations. Asher's report dated July 12, 2001, analyzed these payments, and concluded that $235,661.15 in community cash was used to pay Dr. Provenza's separate obligations with respect to these separate properties. Although Dr. Provenza argues forcefully that the rental income exceeded the mortgage payments and the maintenance on these two properties, no reliable evidence that the community benefitted from income produced by these properties was introduced and admitted at trial. By the same token, Dr. Provenza's argument that the community had benefitted from the depreciation taken on the tax returns is not supported by any evidence.

102. The court finds Asher's report to be reasonable, and there was no expert report contradicting his conclusions. The court finds that the community paid $235,661.15 with respect to Dr. Provenza's separate obligations.

103. Finally, in December, 2002, Northshore (through its trustee, Bill Babin) paid Bank One $140,000.00 in order to satisfy the remaining community indebtedness and Dr. Provenza's personal guarantee of the Southern Neurosurgical Group debt secured by Northshore accounts re-

---

**154.** Joint Exs. 271 through 276.

**155.** There may have been other community bank accounts that Ms. Friend did not succeed in discovering, as suggested by the Schedules attached to Dr. Provenza's affidavit filed in the state court litigation, *see* Joint Ex.

300, 6th page, bottom, which makes reference to "approximately 15" closed accounts.

**156.** Joint Ex. 192.

**157.** Friend Exhibit 24, Schedule III–A–1.

ceivable. From this amount Bank One allocated $13,234.61 to the community debt, and $126,765.39 to the guarantor liability.[158]

104. Dr. Provenza's obligation on the Southern Neurosurgical Group debt is evidenced by his guarantee dated January 12, 1999.[159] This guarantee was executed after the community terminated on September 18, 1998. There is no apparent community purpose for Dr. Provenza's having executed the guarantee. The court finds that Dr. Provenza's guarantee liability with respect to the Southern Neurosurgical Group debt was a separate liability.

105. Accordingly, the trustee's payment to Bank One of $126,765.39 for the purposes of retiring Dr. Provenza's guarantor liability on the Southern Neurosurgical Group debt was the use of a community asset to pay Dr. Provenza's separate liability, for which Ms. Friend is entitled to credit.[160]

106. On September 24, 2002, Ms. Friend received an interim distribution in this matter in the amount of $150,000.00. Once she received this money, the funds became her separate property. She immediately directed that $12,500.00 of the $150,000.00 distribution be paid to Wells Fargo, a community creditor, in order to satisfy a judgment with respect to a community debt. Per her instruction, the trustee made out a separate check payable to Wells Fargo.[161] The court finds that Ms. Friend's $12,500.00 payment to Wells

Fargo (formerly known as Norwest Financial) was a payment of community debt with her separate funds.

107. In toto, Ms. Friend's accounting and reimbursement claims are as follows:

| | |
|---|---|
| Community cash taken by Louis Provenza as of termination of community, plus legal interest: | $ 145,221.96 |
| Use of community funds to pay Jeannette and Avant Garde separate obligations: | 235,661.15 |
| Use of Northshore funds (community property) to pay separate obligation of Dr. Provenza (Southern Neurosurgical Group guarantee): | 126,765.39 |
| Ms. Friend payment of $12,500.00 with separate funds on Wells Fargo/Norwest financial community obligation: | 12,500.00 |
| TOTAL: | $ 520,148.50 |

108. Asher's expert report concluded that Dr. Provenza used $476,640.72 of his separate funds to pay community obligations.[162] Asher had based his analysis on Jack Swetland's report and documents attached thereto, which he assumed would be introduced and admitted at trial. Dr. Provenza chose not to list Swetland as an expert witness in the Joint Pre–Trial Order, and Jack Swetland was not permitted to testify as an expert.[163] Further, at trial, most of the documents relied upon by Swetland in his report were not introduced and admitted as evidence. Accordingly, Asher computed Dr. Provenza's reimbursement claims based on a report and

---

**158.** Tr. Tran., January 28, 2003, pp. 20–21, Exhibits Friend 5 and 6.

**159.** Joint Ex. 205.

**160.** Asher's report, see Friend Exhibit 24, characterizes this payment (then thought to be in the amount of $122,694.77) as a "negative" reimbursement claim for Dr. Provenza, reducing the reimbursement claims that he would have against Ms. Friend. See Friend Exhibit 24, Schedule A, Item III–B–7. The

court finds that this can also, and should instead be characterized as a "positive" reimbursement claim in favor of Ms. Friend.

**161.** Joint Ex. 220.

**162.** Exhibit Friend 23, Schedule A–1.

**163.** See also Tr. Tran., November 5, 2002, pp. 12–13, where Dr. Provenza's counsel stated that Swetland would not be an expert.

documents that were never admitted into evidence at trial.

109. Nevertheless, the court finds that there is evidence to support some reimbursement claims of Dr. Provenza, arising out of Dr. Provenza's use of his separate money to pay community obligations. First, during the debtor-in-possession period, Northshore made payments to Bank One totaling $130,000.00 that Bank One applied to the parties' community indebtedness.[164] Although at first blush this would appear to be a community asset (Northshore) paying the community debt, in fact, Jack Swetland, testifying as a fact witness, stated that he had taken Northshore's payments to Bank One and reclassified them as income to Dr. Provenza for the year 2000.[165] Accordingly, the court finds that the $130,000.00 paid by Northshore to Bank One during the debtor-in-possession period were Dr. Provenza's separate funds, used to pay a community debt.

110. In addition, Dr. Provenza is entitled to a reimbursement claim based on his payment of the 1995 and 1996 income taxes with a cashier's check in the amount of $28,000.00, an amount which is traceable to a community checking accounting for which Dr. Provenza has already been made accountable in Ms. Friend's accounting claim described above.[166] At trial, Dr. Provenza admitted that he did not trace the funds that paid for the other two cashiers' checks drawn with the Internal Revenue Service as payee, and thus rule out the possibility that these other funds came from community sources.[167]

111. Ms. Friend's reimbursement and accounting claim in the amount of $520,148.50, as identified above, is offset by Dr. Provenza's reimbursement and accounting claim of $158,000.00. Accordingly, Ms. Friend's net reimbursement and accounting claim is $362,148.50. She is therefore entitled to $181,074.25 (half of $362,148.50), from Dr. Provenza for this component of her overall claim. Both parties have made extensive claims for reimbursement.[168] To the extent that each of the separate claims of both Dr. Provenza and Ms. Friend are not specifically dealt with by the Court in these findings of fact, or included in a general discussion or finding of fact, they are rejected either for lack of proof and/or no law supports the claim.

### i. Damages for Fraud in a Fiduciary Capacity

112. As authorized under Louisiana community property laws, Ms. Friend seeks damages from Dr. Provenza for his fraud and mismanagement of community property and that these damages be deemed a non-dischargeable debt because they arise from Dr. Provenza's fraud or defalcation while acting in a fiduciary ca-

---

164. Joint Ex. 79, page 6.

165. Tr. Tran., January 30, 2003, p. 103, 106–107.

166. *See* Joint Ex. 201–A, containing a photocopy of the cashier's check for $28,000.00, and Joint Ex. 276 (4th page), a bank statement from Whitney Bank showing a check paid in the amount of $28,000.00 out of the checking account.

167. As Asher testified, it is possible that the funds for these two cashier's checks came from undisclosed community accounts, for which Dr. Provenza has not been made accountable. *See* Tr. Tran., November 26, 2002, p. 130–132. This is especially possible since these cashier's checks were obtained 5 days after the termination of the community, and Dr. Provenza had never accounted for nine of the accounts he made reference to in his affidavit of November 18, 1998. *See* Joint Ex. 300.

168. *See, e.g.,* the 14 separate claims of Dr. Provenza on pp. 51–52 of this Post Trial memorandum.

pacity, under 11 U.S.C. § 523(a)(4) and pursuant to 11 U.S.C. § 523(a)(15), as they arise in the course of a divorce.

113. Although the court has identified numerous unauthorized distributions benefitting Dr. Provenza totaling hundreds of thousands of dollars, the court will measure Ms. Friend's damages with respect to Dr. Provenza's mismanagement of Northshore using, as a starting point, the parties' stipulated value of Northshore as of August 9, 2001.[169] The August 9, 2001 stipulation was designated to be for purposes of Dr. Provenza's Third Amended Plan of Reorganization, but the court finds that purpose to be similar, if not identical, to the present litigation: to determine Ms. Friend's community property interest.[170]

114. Dr. Provenza's actions occurring on, before, and after August 8, 2001, resulted in a chain of events that lead to Northshore's being converted to Chapter 7, and its assets liquidated. The trustee has testified concerning the results of his liquidation and the court finds that based on his testimony, Northshore will have zero value (there will be no assets remaining after creditors are paid) by the time the liquidation of its assets is complete,[171] a finding with which Dr. Provenza agrees.[172]

The court finds that this depletion of Northshore's value was the direct result of Dr. Provenza's fraud and mismanagement.

115. Per the parties' stipulation cited above, the value of Northshore's accounts receivable was $1,000,000.00, and the cash Northshore had on hand as of August 9, 2001 was $459,754.11.[173] Accordingly, the total stipulated value of Northshore was $1,459,754.11.

116. As explained by Harold Asher's testimony at trial, the taxes owed reduced the stipulated value by $233,560.66.[174] He then reduced the claim further by recognizing payments made from the liquidation proceeds of Northshore to reduce the parties' community debt to Bank One.[175] Those payments total $193,332.65. Finally, Asher further reduced the damage claim by the amounts of other payments by Northshore to Bank One which Asher (and the court) have already computed into the reimbursement claim computation (thus, eliminating double counting). Per Asher's calculation and report, the total fraud and mismanagement claim is $910,166.03.[176]

117. The court finds Asher's report, including its methodology and calculation, to be reasonable and correct, and supported

---

**169.** Joint Ex. 309, p. 2, par. 5, and Exhibit A thereto, p. 7.

**170.** Dr. Provenza's plan proposed that he acquire a 100% interest in all of the community property, and that he pay equalizing payments to Friend in return, based on the properties' valuation. That valuation, for that purpose, is both relevant and appropriate to determine the corporation's value for purposes of computing the mismanagement claim.

**171.** The trustee stated that predicated upon the $175,000.00 settlement being approved and collected (which it was), there would be between $10,000.00 and $35,000.00 remaining after creditors and administrative expenses, not including taxes, were paid. The

trustee did not believe taxes would exceed $10,000.00 to $35,000.00. *See* Tr. Tran., November 21, 2002, pp. 78–79.

**172.** Joint Pre–Trial Order, Defendant, Louis J. Provenza's statement of facts which are contested by Louanne Friend No. 55.

**173.** Joint Ex. 72, Resource Bank account statement, page 4, attached thereto. The court will delve further into the issue of the date of valuation later on in the opinion.

**174.** Tr. Tran., November 26, 2002, p. 140.

**175.** *Id.* p. 141.

**176.** Friend 24, Schedule A.

by the evidence. The court also notes that there is no opposing expert report. Accordingly, the court finds that Ms. Friend, the community co-owner of Northshore, is entitled to half of the damage caused to Northshore by Dr. Provenza's fraud and mismanagement, or 50% of $910,166.03, which computes to $455,083.01.

118. As previously discussed, the court found that Dr. Provenza distributed $45,000.00 from the Lakeview Corporation to himself, for no consideration. Ms. Friend's claim for Dr. Provenza's fraud and mismanagement of Lakeview Corporation is one-half of $45,000.00, or $22,500.00.

119. As discussed earlier, the court identified two components of Dr. Provenza's mismanagement of the Bluevue Corporation, one being his failure to collect the MPH note in the amount of $76,500.00; and the other, being the August 3, 2001 distribution from Bluevue to himself of $22,000.00. The total of these two components is $98,500.00. Ms. Friend's damage claim is for half of this sum, or $49,250.00.

120. Ms. Friend's damages resulting from Dr. Provenza's mismanagement of community funds, with the result that he failed to pay community income taxes and thus incurred substantial penalties and interest, as discussed earlier, is one-half of $71,857.00, or $35,928.50.

121. In sum, Ms. Friend's damages for Provenza's fraud and mismanagement of community assets are as follows:

| | | |
|---|---|---|
| Northshore | $ 910,166.03 times one-half | $ 455,083.02 |
| Lakeview Corporation | 45,000.00 times one-half | 22,500.00 |
| Bluevue Corporation | 98,500.00 times one-half | 49,250.00 |
| Income taxes | 71,857.08 times one-half | 35,928.54 |
| TOTAL: | | $ 562,761.56 |

#### 4. Summary

##### a. Community Claims and Accounting/Reimbursement

122. In summary, the court quantifies Ms. Friend's total claims as follows: [177]

| | |
|---|---|
| Community Property Claim with Respect to Property/Funds Held by the Bankruptcy Estate: | $ 708,960.69[178] |
| Ms. Friend's Claim with Respect to Community Assets Outside the Estate: | 161,518.81 |
| Ms. Friend's Net Accounting and Reimbursement Claim: | 181,074.25 |
| Ms. Friend's Fraud and Mismanagement Claims: | 562,761.56 |
| TOTAL: | $1,614,315.31 |

##### b. Dr. Provenza: Present Income and Ability to Pay

123. At trial Dr. Provenza testified that he presently earns $67,000.00 per month after business expenses.[179] This translates into earnings of $804,000.00 per year. His earnings may in fact be substantially higher, given that his testimony was that his business has expended $100,000.00 per month on professional fees ("CPA, attorney's fees, expert fees") since shortly after the conversion of the bankruptcy cases to

---

177. This assumes that the 5th Circuit reverses the district court's holding with regard to the community property issues.

178. This dollar amount is already net of the interim distribution of $150,000.00.

179. Tr. Tran., January 28, 2003 at p. 182.

Chapter 7.[180] On cross-examination, Dr. Provenza testified that he was considering the personal attorney's fees for this litigation to be a business expense.[181] Even though his medical practice pays the attorney's fees, a substantial portion, if not all of those fees may in fact be Dr. Provenza's earnings as well, as attorneys fees for the litigation at bar are not ordinary and necessary expenses of a medical practice.

124. Dr. Provenza testified that with this monthly personal income of $67,000.00, he had over $80,338.00 in monthly expenses, and that he is borrowing money to make up the difference.[182] He testified that he was paying some $50,000.00 per month in mortgage payments with respect to loans he took out in order to repurchase estate property that was being sold by the trustee.[183]

125. Dr. Provenza also told the court that he had $3,800.00 a month in real estate taxes, $4,100.00 per month to pay on the $400,000.00 loan he took out to purchase the movables and pay other expenses,[184] and that he pays another $1,500.00 per month for condo association fees on properties that he repurchased.

126. Altogether, it appears that Dr. Provenza now spends between $55,000.00 and $60,000.00 per month to service the debt and pay taxes and condo fees on properties he voluntarily and aggressively

purchased from the bankruptcy estate.[185] In addition, Dr. Provenza is also still incurring hangar fees for the aircraft in Texas and the two in Slidell.[186]

127. Dr. Provenza states that he has more debt now than he did when he went into bankruptcy, estimating his original debt to be around 2.5 million dollars, and stating that his present debt is a little over 4.5 million dollars.[187] The fact that he voluntarily incurred mortgages and other debts to purchase investment real estate (which is not producing income) and the airplanes, airport lease, and other miscellaneous properties, does not mitigate his obligation to pay Ms. Friend's claim. Dr. Provenza is free to sell these real estate assets. Similarly, Dr. Provenza's attorneys fees ($100,000.00 per month going back to shortly after the cases were converted to Chapter 7—according to Dr. Provenza) can abate if Dr. Provenza so chooses. The court finds that Dr. Provenza is able to pay the claim of Ms. Friend.

128. The court also finds that the benefit to Dr. Provenza of having Ms. Friend's claim discharged does not outweigh the detriment to Ms. Friend if discharge of the claim is granted. Ms. Friend's credible and uncontradicted testimony shows that Ms. Friend has no wealth, a modest income of $36,000.00 per year, and although her husband earns $250,000.00 per year

180. *Id.* at p. 170.

181. *Id.*

182. *Id.* at p. 182.

183. *Id.* at p. 175. Dr. Provenza testified that he bought these properties to prevent them from being sold at distressed values. There is no evidence to support Dr. Provenza's opinion that the properties were going to be sold at distressed values. To the contrary, the trustee felt the properties were all being sold at full market value and that Dr. Provenza overbid the market value bid of the other

bidders. Thus, his plea of overburdening new debt falls on deaf ears as it is self induced.

184. *Id.* at p. 176. Dr. Provenza testified that he borrowed this money to purchase some movables, to pay Bank One on the Southern Neurological Group loan and to pay Dr. Rogers, a physician with whom he works.

185. *Id.* at p. 175–176.

186. *Id.* at p. 181.

187. *Id.* at p. 185–186.

(less than one-third of Dr. Provenza's earnings), they are separate in property, and Ms. Friend has extensive debt.[188]

129. The court is aware of the resources Ms. Friend has invested in asserting her claims in these bankruptcy proceedings. Her efforts have served not only her own interest, but those of other creditors, as well. To deprive her of payment on her claim through the discharge of Dr. Provenza's debt to her would be of substantial detriment to her, far outweighing any benefit Dr. Provenza would enjoy from discharging those claims.

## II. CONCLUSIONS OF LAW

### A. Overview

#### 1. Procedural History

As stated earlier, before the court were Dr. Provenza's objection to claims filed by Ms. Friend and Ms. Friend's complaint objecting to the Chapter 7 discharge of Dr. Provenza's indebtedness to Ms. Friend, which were tried together. Ms. Friend also filed a § 727 objection to the discharge of Dr. Provenza's debts, but she agreed to postpone the trial of that issue pending the outcome of this trial. The court is confronted with a Chapter 7 individual debtor, divorced but owning an undivided interest in unpartitioned property that was community property during his marriage.

#### 2. Governing Law

▇▇▇ Under Louisiana law, when the community of acquets and gains is terminated, the property that had comprised the community of acquets and gains technically is no longer considered "community

property." Rather, it is considered "former community property," even though it has yet to be partitioned. The Bankruptcy Code does not recognize this distinction. The term "community property," as used in the Bankruptcy Code,[189] encompasses both community property of an existing community, and the unpartitioned property of a terminated community property regime. Absent a partition following the termination of a community property regime, the entire property of the former community, even the half belonging to the spouse who is not a debtor, becomes property of the bankruptcy estate.[190] In this case, the debtor's bankruptcy estate consisted of both former community property that had yet to be partitioned (often referred to herein as simply "community property"), and his own separate property.

▇▇▇ Federal bankruptcy law governs the liquidation of the bankruptcy estate's assets and the distribution to creditors of those proceeds. Louisiana law is the authority that determines the property rights of the former community property regime and also determines its debts.[191] As the Bankruptcy Code has special provisions with respect to the liquidation and distribution of proceeds in cases where the estate is comprised of both community property and separate property, the issues presented herein are governed by both federal bankruptcy law and Louisiana community property law.

#### 3. Other issues:

Before the court delves into the legal analysis of the case, it will address a few

---

188. Tr. Tran., January 30, 2003, pp. 118–127.

189. *See* 11 U.S.C. § 541(a)(2), defining property of the estate, and 11 U.S.C. § 726(c), dealing with the distribution of estate proceeds.

190. 11 U.S.C. § 541(a)(2); *In re Robertson*, 203 F.3d 855, 861 (5th Cir.2000); *In re Hendrick*, 45 B.R. 976, 983–984 (Bankr.M.D.La. 1985).

191. *Hendrick*, 45 B.R. at 982.

different issues. The trial presented lengthy, detailed and complicated factual issues turning on the credibility of the witnesses, numerous documents and often a lack of documents to support a party's position. Thus, first and foremost, the court should address Dr. Provenza's credibility. As expected, the parties presented the court with dramatically different versions of the facts comprising the case. This is the nature of an adversary proceeding—it is adversarial. From the beginning, though, the court has witnessed a case with almost as much drama and deception as a Shakespearean tragedy.

Commencing with a refusal to acknowledge that the signatures on the bankruptcy filings were his and not acknowledging that he had opened accounts to which he transferred estate funds without reporting the accounts to the trustee, Dr. Provenza slowly dissipated any semblance of credibility with the court. Dr. Provenza's testimony ranged from lack of attention to day to day details, to forgetfulness of important facts, to wariness to answer direct questions, to obvious out-and-out evasion.

Dr. Provenza did not so much offend the court as he made the court wonder what, exactly, he was hiding. Fortunately for the court, for Ms. Friend and for the interest of justice, what he was hiding became much clearer once the court delved into the details of Dr. Provenza's and Northshore's records. Dr. Provenza's non-cooperation required this court to spend a huge amount of time trying to find what was under the nutshells of his painfully obvious shell game. Had Dr. Provenza simply presented the truth and not bounced his assets from place to place, this trial would have concluded with just results in a much shorter time.

Dr. Provenza has, throughout these entire bankruptcy proceedings, shown several propensities that have added to his problems such as:

1. His refusal to recognize that when his financial condition worsened, he should have disposed of some, if not many, of his expensive, non-income producing properties.

2. His refusal to recognize that under Louisiana law, he had an obligation to account to and pay Ms. Friend her undivided one-half of the property of the former community.

3. His choice of trying to resolve what was essentially a two party dispute by filing voluntary Chapter 11 proceedings for both Northshore and himself.

4. His failure to file promptly the necessary federal and state income tax returns, failure to pay taxes due, and incurrence of substantial penalties and interest.

5. His refusal to have a confirmation hearing on what might have been a consent plan of reorganization that would have disposed of this case at a much earlier date.

6. His change of lawyers so that from the outset to the present he has been represented individually by three different sets of attorneys plus another attorney for Northshore.

Dr. Provenza claims that Ms. Friend's expert, Harold Asher, was not competent to give testimony in this case because he has never evaluated a medical corporation in a Chapter 7 bankruptcy case. As well, Dr. Provenza claims that the substance of Mr. Asher's reports and testimony was given to him by Ms. Friend's attorney and not accumulated from the facts of the case. In what appears to be a case of wishful thinking, Dr. Provenza argues that Asher's testimony was the only vehicle used at trial by Ms. Friend in support of her allegations of fraud and mismanagement.[192]

---

192. Provenza Post Trial Memoranda and Response.

Unfortunately for Dr. Provenza, the documents and testimony were a vehicle in and of themselves, sufficient to permit the court to reach the decisions necessary to resolve this longstanding controversy between the debtor and his ex-wife—an issue that should have been resolved in state court in the first place instead of through a three year bankruptcy proceeding. Mr. Asher simply served to point out to the court how a fraud expert would analyze problems such as disappeared funds and lack of invoices for checks to major companies who could easily provide copies of such invoices. The court relied on Mr. Asher's conclusions for two main items. First, to understand the indicia of fraud that an expert fraud investigator looks for when analyzing a company's documents and transactions. Second, the court relied on Mr. Asher to compile the discovery documents in a manner that allowed the court to understand them. He simply summarized documents based on the information provided by both sides. Moreover, the documents provided solely by Ms. Friend were used to give Dr. Provenza credits where they were due.

## B. Legal Application

■ As a starting point, the court will address the disposition of community assets within the bankruptcy estate. Section 726(c) of the Bankruptcy Code governs distributions in cases in which there is both community property and non-community property in the estate, such as the case at bar. The Fifth Circuit characterizes § 726(c) as creating a "sub-estate" that calls for the segregation of community property in the estate from other property of the estate, and for the order of distribution of the two kinds of property in payment of claims: First, administrative expenses are paid equitably from both kinds of property;[193] Second, community claims against the debtor or the debtor's spouse are paid from community property, except those debts solely incurred by the debtor for the debtor's benefit;[194] Third, community claims against the debtor to the extent not paid under the above provision, are paid from community property that is solely liable for the debts of the debtor;[195] Fourth, to the extent that all claims against the debtor including community claims are not paid under the above provisions, such claims are paid from property of the estate other than community property of the estate;[196] Fifth, if any community claims against the debtor or the debtor's spouse remain unpaid, they are paid from whatever property remained in the estate.[197]

### 1. The Estates

#### a. The Community Property Sub-estate

The court has identified funds derived from the trustee's liquidation of community and/or jointly owned assets totaling $2,357,281.38.[198] If the Fifth Circuit reverses the district court's determination that Caribe, Troon, and Jesse Wells Road properties were *not* community property, the entire $2,357,281.38 will be community property. If, on the other hand, the Fifth Circuit affirms the decision of the district court, then the community property proceeds held by the trustee will total $1,227,513.88.

193. 11 U.S.C. § 726(c)(1).

194. 11 U.S.C. § 726(c)(2)(A).

195. 11 U.S.C. § 726(c)(2)(B).

196. 11 U.S.C. § 726(c)(2)(C).

197. 11 U.S.C. § 726(c)(2)(D); *Robertson,* 203 F.3d at 863.

198. F.of F. 89.

### (i). Payment of Community Claims and Expenses

In the case at bar, the First, Second, and Fourth of the above listed *Robertson* categories are implicated, corresponding to §§ 726(c)(1), 726(c)(2)(A), and 726(c)(2)(C).

### a). Payment of Administrative Expenses

■ The community "sub-estate" will be charged with administrative expenses per § 726(c)(1), consisting of the capital gains and other income taxes generated from the liquidation of community assets, rental income, and interest income, with those taxes totaling $209,271.62.[199]

### b). Payment of Community Claims Against Dr. Provenza or Ms. Friend

The community "sub-estate" will pay community claims against the debtor or the debtor's spouse totaling $430,088.39, to be distributed pursuant to 11 U.S.C. § 726(c)(2)(A).[200]

With the above-described distribution of $430,088.39, all community claims will have been paid. This will leave a "community surplus" of $1,717,921.37 in community funds after payment of the community administrative expenses and the community taxes. Ms. Friend, as co-owner of these funds pursuant to La. Civ.Code Ann. art. 2369.1, is entitled to 50% of this amount, or $858,960.69.[201] Because she has already received an interim distribution of $150,000.00, she is presently entitled to $708,960.69.

### b. Dr. Provenza's Separate Estate

Dr. Provenza's separate estate is entitled to the other half, or $858,960.69,[202] thus implicating the distribution pursuant to 11 U.S.C. § 726(c)(2)(C). As stated above, this sub-paragraph provides for payment from property of the estate "other than property of the kind specified in section 541(a)(2)" (i.e., other than community property) of all claims against Dr. Provenza, including community claims against him that are unpaid. Because the community debts have already been paid, this leaves only Dr. Provenza's separate debts (as well as administrative expenses) to be paid from his half of the community surplus, which would become his separate estate.

The court has identified the community assets outside of the bankruptcy estate, none of which were liquidated by the trustee, as having a total value of $360,564.09. Out of the assets comprising this total value, Ms. Friend received and enjoyed the cash value from one life insurance policy, the Lexus, and her VALIC retirement fund, for a total of $18,763.24. Dr. Provenza retained, consumed, and/or mortgaged the balance of those assets.[203]

■ Under Louisiana community property partition principles, the court is required to divide the community assets and liabilities so that each spouse receives property of an equal net value.[204] The court is empowered to divide a particular asset equally or allocate it in its entirety to

---

199. F.of F. 96.

200. F.of F. 90.

201. La. Civ.Code Ann. art 810.

202. If the Fifth Circuit affirms the district court's decision with respect to Caribe, Troon, and Jesse Wells Road, the "community surplus" will be $754,487.78, Ms. Friend's half (less the $150,000.00 interim distribution) will be $227,218.89, and Dr. Provenza's separate estate will be entitled to $377,218.99.

203. F. of F. 98.

204. La.Rev.Stat. Ann. 9:2801A(4)(b).

one of the spouses.[205] In the event that the allocation of assets results in an unequal net distribution, the court shall order the payment of an equalizing sum of money upon such terms and conditions as the court shall direct.[206] In this allocation, the court must consider the nature and source of the asset, the economic condition of each spouse, and any other circumstances that the court deems relevant.[207]

■ Considering that Dr. Provenza has mortgaged the remaining community insurance policies, consumed the homestead exemption, benefitted from the community tax deductions, and has been in possession of all other community movables since 1998, the court will recognize and allocate those assets to Dr. Provenza and award Ms. Friend her right to an equalizing payment in the amount of $161,518.81.[208]

## 2. The Parties' Reimbursement and Accounting Claims Under State Law

Ms. Friend and Dr. Provenza each assert claims against the other for recognition of reimbursement and/or accounting claims under Louisiana community property law. These claims are as follows:

### a. Claims Under Article 2369

Civil Code Article 2369 provides that a spouse owes an accounting to the other spouse for community property under his control at the termination of the community property regime.

At trial, Ms. Friend proved that as of September 18, 1998, the date that the community terminated, Dr. Provenza was in possession of community funds totaling $112,305.21 for which he is accountable to Ms. Friend that amounts to $145,221.96, which includes legal interest, through the date of trial.[209] On the other hand, Dr. Provenza alleged and proved no accounting claims against Ms. Friend.

### b. Claims Under Articles 2364 and 2366

Civil Code Article 2364 provides that if community property has been used to satisfy a separate obligation of one spouse, the other spouse is entitled to reimbursement upon termination of the community property regime for one-half of the amount or value that the property had at the time it was used. In addition, Civil Code Article 2366 provides that if community property has been used for the acquisition, use, improvement, or benefit of the separate property of a spouse, the other spouse is entitled upon termination of the community to one-half of the amount or value the community property had at the time it was used.

At trial, Ms. Friend established that the community paid $235,661.15 with respect to Dr. Provenza's separate obligations during the marriage.[210] In addition, in December, 2002 Northshore, through its trustee, paid Bank One $126,765.39 with respect to Dr. Provenza's guarantor liability related to the Southern Neurosurgical Group debt.[211] Because Northshore is a community asset, and Dr. Provenza's

**205.** La.Rev.Stat. Ann. 9:2801A(4)(c).

**206.** La.Rev.Stat. Ann. 9:2801A(4)(d).

**207.** *Hare v. Hodgins,* 586 So.2d 118, 122–23 (La.1991); *Kambur v. Kambur,* 652 So.2d 99, 102 (La.App. 5th Cir.1995).

**208.** This sum results from dividing the liquidated non-estate community assets and subtracting Ms. Friend's enjoyed cash value on the listed items.

**209.** F.of F. 100.

**210.** F.of F. 102, 107.

**211.** F. of F. 102–105.

guarantor liability with respect to the Southern Neurosurgical Group debt was a separate obligation of Dr. Provenza, Ms. Friend is entitled to a reimbursement claim based on the $126,765.39 payment.[212] On the other hand, Dr. Provenza did not allege or establish the use of community funds to pay any of the separate obligations of Ms. Friend.

### c. Claims Under Article 2365

Civil Code Article 2365 states that if separate property of a spouse has been used to satisfy a community obligation, that spouse, upon termination of the community property regime, is entitled to reimbursement for one-half of the amount or value that the property had at the time it was used.

At trial, Ms. Friend established that she paid and satisfied the Wells Fargo/Norwest community obligation with $12,500.00 of her separate funds, thus providing the basis for a reimbursement claim based on Civil Code Article 2365.[213] On the other hand, Dr. Provenza proved that $158,000.00 of his separate funds were used to pay community debts, this sum being comprised of the $130,000.00 that Northshore paid to Bank One on Dr. Provenza's behalf,[214] and the $28,000.00 cashier's check that was traceable to a checking account which Dr. Provenza had disclosed.[215]

### d. Summary of Reimbursement and Accounting Claims

Altogether, based on the reimbursement and accounting claims authorized by Civil Code Articles 2369, 2364, 2366, and 2365, Ms. Friend has claims based on payments totaling $520,148.50, and Dr. Provenza has claims based on payments totaling $158,000.00. The difference is $362,148.50, for which Ms. Friend is entitled to one-half, or $181,074.25, as her net total reimbursement and accounting claims against Dr. Provenza.[216]

### 3. Fraud and Mismanagement Claims

At trial, Ms. Friend contended that Dr. Provenza fraudulently mismanaged various community assets after the termination of the community. The court finds that Dr. Provenza fraudulently mismanaged the assets of Northshore, the Lakeview Corporation, the Bluevue Corporation, R & P Leasing, and during the marriage had also mismanaged community cash by failing to pay income taxes.

### a. Exception to Discharge Under § 523(a)(4)

As part of the relief she is requesting, Ms. Friend seeks that the court declare her fraud and mismanagement claim[217] to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(4), which excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity."

 In the Fifth Circuit, the concept of "fiduciary" under § 523(a)(4) is narrowly defined, applying only to technical or express trusts, and not those which the law implies from contract. In addition, the requisite trust relationship must exist prior to the act creating the debt and without reference to that act. In other words, the trust giving rise to the fiduciary relationship must be imposed prior to any wrongdoing. The debtor must have been a fiduciary before the wrong and without

---

212. F. of F. 105.

213. F. of F. 106.

214. This amount is credited to Dr. Provenza because Northshore reported these amounts as income to Dr. Provenza for tax purposes.

215. F. of F. 110.

216. F. of F. 111, 122.

217. Totaling $562,761.56.

any reference to it. In determining whether a particular debtor was acting in a fiduciary capacity for purposes of § 523(a)(4), the court must look to both state and federal law. The scope of the concept of fiduciary under § 523(a)(4) is a question of federal law; however, state law is important in determining whether or not a trust obligation exists. The "technical" or "express" trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to the statute or common law. Thus, the trust obligations necessary under § 523(a)(4) can arise pursuant to a statute, common law, or a formal trust agreement.[218]

Ms. Friend contends that Dr. Provenza was a fiduciary for purposes of 11 U.S.C. § 523(a)(4), based of duties imposed upon him under both Louisiana law and federal bankruptcy law.

### (i). Duties Under Louisiana Community Property Law

■ At the time that a marriage is dissolved and the community property is subject to being partitioned, there is a fiduciary relationship between the ex-husband and wife.[219] The former spouse having control and possession of any community asset owes a fiduciary duty to the spouse not in control.[220]

This duty is based upon Louisiana Civil Code Article 2369.3 which states, in pertinent part:

A spouse has a duty to preserve and to manage prudently former community property under his control, including a former community enterprise, in a manner consistent with the mode of use of that property immediately prior to termination of the community regime. He is answerable for any damage caused by his fault, default, or neglect.

■ The standard imposed by Civil Code Article 2369.3 is higher than the standard of care in managing and maintaining community property during the marriage. "The reason for imposing a higher standard of care in managing former community property is that, after termination of the community property regime, the law no longer assumes that a spouse who has former community property under his control will act in the best interest of both spouses in managing it."[221]

■ The provisions of Article 2369.3, coupled with Louisiana state court jurisprudence, establish the creation of both a trust and fiduciary relationship, arising at the time that the marriage is dissolved and the community is terminated. This relationship exists regardless of any wrongdoing and without reference to a specific act creating any debt. The "res" of the trust is the community property under the respective spouses' control.[222]

The court finds that under Louisiana law, Dr. Provenza had a fiduciary duty to Ms. Friend with respect to community

**218.** *Matter of Bennett,* 989 F.2d 779, 784–785 (5th Cir.1993), *cert. denied,* 510 U.S. 1011, 114 S.Ct. 601, 126 L.Ed.2d 566 (1993).

**219.** *McCarroll v. McCarroll,* 701 So.2d 1280, 1282 (La.1997); *Pitre v. Pitre,* 247 La. 594, 172 So.2d 693, 695 (1965); *Terry v. Terry,* 565 So.2d 997, 1001 (La.App. 1 Cir.1990).

**220.** *Terry,* 565 So.2d at 1001; *Queenan v. Queenan,* 492 So.2d 902, 912 (La.App. 3d Cir.) *writ denied,* 496 So.2d 1045 (La.1986); *see also Brown v. Brown,* 680 So.2d 1203, 1211 (La.App. 2d Cir.1996).

**221.** Official Comments following Louisiana Civil Code Article 2369.3.

**222.** *See, e.g., In re Stanifer,* 236 B.R. 709, 713–718 (9th Cir. BAP 1999).

property under his control, arising as of September 18, 1998, such that fraud or defalcation in connection therewith would give rise to an exception to discharge under 11 U.S.C. § 523(a)(4).

*(ii). Duties Under the Bankruptcy Code*

■ On March 29, 2000, Dr. Provenza filed an individual voluntary Chapter 11 petition. Upon the filing, Dr. Provenza became a "debtor-in-possession" pursuant to 11 U.S.C. § 1107(a). This section of the Bankruptcy Code creates a statutorily imposed trust when the bankruptcy petition is filed. The debtor-in-possession has all the rights and duties of a Chapter 11 trustee. The beneficiaries of the trust are the claim holders against the estate.[223] The trust "res" is property of the estate as defined in 11 U.S.C. § 541. This includes any interest in property that the estate obtains after the petition is filed. The duties owed to the beneficiaries by the trustee are defined in part by §§ 1107, 1006(a)(1) and 704(2). Section 704(2) provides that the debtor-in-possession, as trustee, shall be accountable for all property received.[224]

As a trustee in a fiduciary capacity, the debtor-in-possession must use estate property only under the terms and conditions imposed by the Code. These limitations are found at § 363(a) and (c). They limit the scope of a debtor-in-possession's authority to traffic in estate property and establish the express terms and conditions of the trust relationship between the debtor-in-possession and the creditors of the estate. Failure of the debtor-in-possession

to abide by these limitations or to comply with the statute results in a breach of the terms of the statutorily imposed trust.[225] Accordingly, the court finds that Dr. Provenza was a fiduciary for purposes of 11 U.S.C. § 523(a)(4) with respect to property of his individual bankruptcy estate.

■ Also, on March 29, 2000, Dr. Provenza caused Northshore Surgery Associates, APMC, to file a voluntary Chapter 11 petition. Upon filing, Northshore, too, became a debtor-in-possession pursuant to 11 U.S.C. § 1107(a), and a statutory trust was created. For all intents and purposes, Dr. Provenza conducted the operations of Northshore as a sole proprietorship. He was the only functioning officer of the business. He was the 100% shareholder, the day-to-day manager, and the overall decision maker for Northshore. No other officers or directors functioned in a managerial capacity in the business. Under all circumstances, the actions of Northshore were the actions of Dr. Provenza.

It is now well established that when the Chapter 11 debtor-in-possession is a corporation, corporate officers and directors are considered to be fiduciaries both to the corporate debtor-in-possession and to creditors.[226] The liabilities of Northshore as a result of a breach of fiduciary duty clearly run to Dr. Provenza, unprotected by the corporate status of Northshore.[227] The court finds that Dr. Provenza was a fiduciary of Northshore for purposes of 11 U.S.C. § 523(a)(4).

**223.** *In re Black,* 179 B.R. 509, 513–514 (Bankr.E.D.Tex.1995); *In re Weber,* 99 B.R. 1001, 1009 (Bankr.D.Utah 1989).

**224.** *Weber,* 99 B.R. at 1010.

**225.** *Id.*

**226.** *In re Anchorage Nautical Tours, Inc.,* 145 B.R. 637, 643 (9th Cir. BAP 1992); *In re*

*Performance Nutrition, Inc.,* 239 B.R. 93, 111 (Bankr.N.D.Tex.1999); *In re Hampton Hotel Investors, L.P.,* 270 B.R. 346, 362 (Bankr. S.D.N.Y.2001); *see also* Rule 9001(5), Federal Rules of Bankruptcy Procedure.

**227.** *Weber,* 99 B.R. at 1011–1012.

### (iii). Extent of Liability Excepted From Discharge Under 11 U.S.C. § 523(a)(4)

The court concludes that Dr. Provenza's liability to Ms. Friend resulting from his mismanagement of Northshore, the Lakeview Corporation, the Bluevue Corporation, and R & P Leasing is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4). On the other hand, Ms. Friend's damages resulting from Dr. Provenza's mismanagement of community cash arising out of his failure to pay income taxes are not excepted from discharge under § 523(a)(4).

 Dr. Provenza's use and/or misdirection and mismanagement of the assets of Northshore, Lakeview Corporation, Bluevue Corporation, and R & P Leasing took place after he became a fiduciary as a result of the termination of the community. In addition, this mismanagement of these assets occurred after he filed his individual Chapter 11 bankruptcy proceeding, while he was debtor-in-possession, and therefore a fiduciary of the creditors of his bankruptcy estate, including Ms. Friend. Indeed, Dr. Provenza's individual bankruptcy estate owned 100% of the stock of Northshore, the Lakeview Corporation, and the Bluevue Corporation, and as a fiduciary, he had a duty to preserve the value of those assets. Instead, as set forth in the court's findings of fact, Dr. Provenza willfully caused these entities to make unauthorized distributions to himself and/or otherwise waste those assets, breaching his fiduciary responsibilities as set forth under both Louisiana law and federal bankruptcy law. Further, these actions were both defalcatory and fraudulent.[228]

 Dr. Provenza's mismanagement of community assets by failing to pay income taxes incurred *prior* to the termination of the community (and therefor prior to the establishment of the fiduciary relationship under Louisiana law), does not give rise to an exception to discharge under § 524(a)(4).

In summary, the court declares that $540,833.02 of Ms. Friend's claim against Dr. Provenza is non-dischargeable, computed as follows:

| | | |
|---|---|---|
| Northshore Neurological [229] | $ 910,166.03 times one-half | $ 455,083.02 |
| Lakeview Corporation [230] | 45,000.00 times one-half | 22,500.00 |
| Bluevue Corporation [231] | 98,500.00 times one-half | 49,250.00 |
| R & P Leasing [232] | 28,000.00 times one-half | 14,000.00 |
| TOTAL: | | $ 540,833.02 |

### (iv). The Northshore Valuation Date

The court has found that the stock of Northshore Neurological Surgery Associates, APMC, was a community asset. Ms. Friend contends that her community property interest in this asset should be determined as of the date of the partition, as set forth at Louisiana R.S. 9:2801A(4)(a). Be-

228. A defalcation is a willful neglect of duty, even if not accompanied by fraud or embezzlement. *In re Bennett*, 989 F.2d at 790.

229. F.of F. 117, 121.

230. F.of F. 118, 121.

231. F.of F. 119, 121.

232. F.of F. 77.

cause that value is zero, she claimed damages arising out of Dr. Provenza's post divorce fraud and mismanagement of Northshore based on the parties' August 9, 2001 stipulated valuation of Northshore's cash and accounts receivable in the amount of $1,459,754.11. Taking this number as a starting point, and reducing that amount by Northshore payments that could be traced to the reduction of Northshore debt and/or community debt, Ms. Friend's calculation of Dr. Provenza's damage to Northshore through his fraud and mismanagement was $910,166.03, giving rise to her claim in the amount of $455,083.02, with which the court concurred.[233]

On the other hand, Dr. Provenza continues to assert that Ms. Friend's community property interest in Northshore terminated as of the date of the termination of the community, September 18, 1998.[234] Dr. Provenza argues that Ms. Friend's claim is restricted to one-half of the value of Northshore as of that date.

 On September 19, 2001, this court entered its Order and Reasons for

Order,[235] ruling that Ms. Friend's community property interest in the stock of Northshore continued beyond the date of the termination of the community, and would be properly determined as of the date of the partition. This is the law of the case, and will not be revisited.[236]

 Certainly, the law of the case doctrine is discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.[237] The major grounds for justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice. None of these factors are implicated here. In fact, the new evidence presented at the recent trial established that Northshore's revenues were generated from the professional services of both Dr. Provenza and Dr. Rogers, that Northshore profited from both of these physicians' services, and that its assets were not generated "solely" by Dr. Provenza's professional skill and effort, an argument this court has already found to be unpersuasive.

---

**233.** F. of F. 116, 117.

**234.** There is a considerable swing in the value as it was stipulated by the parties to be $600,000 if valued on September 18, 1998 and $1,000,000 plus cash on hand if valued on August 9, 2001.

**235.** Joint Exs. 307 and 308.

**236.** Under the law of the case doctrine, a court may not address issues that have been litigated and decided in earlier proceedings in the same case. *In re Highland Financial Corporation*, 216 B.R. 109, 113 (Bankr.S.D.N.Y. 1997). The doctrine is "based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter." *United States v. United States Smelting, Refining, and Mining Co.*, 339 U.S. 186, 70 S.Ct. 537, 544, 94 L.Ed. 750 (1950). Issues

decided at an early stage of the litigation, either explicitly or by necessary inference from the disposition, constitute the law of the case. *In re Kenneth Allen Knight Trust*, 303 F.3d 671, 676 (6th Cir.2002). One facet of the law of the case doctrine is that a single court must adhere to its own prior rulings without need for repeated consideration. *In re Grand Valley Sport and Marine, Inc.*, 143 B.R. 840, 853 (Bankr.W.D.Mich.1992). The fact that the court's prior order was in a contested matter separate from the contested matter and adversary presently before the court is of no moment. The parties and the legal issues are identical. *See Artra Group, Inc. v. Salomon Brothers Holding Company*, 1996 WL 637595 (N.D.Ill.1996), *citing Cohen v. Bucci*, 905 F.2d 1111, 1112 (7th Cir.1990).

**237.** *DiLaura v. Power Authority of State of New York*, 982 F.2d 73, 76 (2d Cir.1992).

### b. Exception to Discharge Under § 523(a)(6)

Section 523(a)(6) excepts from discharge debts for willful and malicious injury by the debtor to another entity or to the property of another entity. The Supreme Court has held that for a debt to fall within the ambit of § 523(a)(6), an action must be not merely negligent or even grossly negligent, but must to some degree be intentional.[238] According to controlling Fifth Circuit jurisprudence, an injury is "willful and malicious," where the actor harbored "either an objective substantial certainty of harm or a subjective motive to cause harm."[239]

In determining whether Dr. Provenza's actions evidenced an objective substantial certainty of harm or a subjective motive to cause harm, the court may look to the actions of the debtor and circumstantial evidence.[240] Ms. Friend argues that if the court has found that Dr. Provenza's causing Northshore, a community entity, to overcompensate him, was a knowing conversion of property,[241] then the court must also find that under 523(a)(6), he therefore had a subjective motive to cause harm to Ms. Friend. Ms. Friend argues the same with the court's findings that Dr. Provenza's use of Northshore funds for his personal benefit, above and beyond his court authorized compensation, was knowing and fraudulent. As well, she argues this with regard to his payment to the Patients Compensation Fund on August 8, 2001 that constituted a prepayment to Dr. Provenza's 2002 premium, paid in order to decrease Ms. Friend's equity in Northshore.[242] The court made a similar finding with respect to the Northshore disbursements to Premier Computing, and other apparent prepayments set forth more fully in the court's findings of fact.[243] Each and every wrong done by Dr. Provenza to Ms. Friend, Ms. Friend argues, should be non-dischargeable under 523(a)(6).

Here, sympathy for Ms. Friend's being denied her share of the community for years and a sense of fair play would probably support a finding that Dr. Provenza intended to cause harm to the property of Ms. Friend through his long and well-documented delays in paying her the proper amounts for her undivided interest in the community property. The court finds, however, that Ms. Friend has not shown enough tangible evidence to reveal Dr. Provenza's subjective motive. Clearly, he was negligent and clearly he engaged in fraud. One would think, given the evidence, that he did this to ensure that his ex-wife received as little money as possible. This sympathy and sense of fair play, however, do not a solid evidentiary foundation make as to subjective intent.

By a like token, under the substantial certainty of harm test from *Kawaauhau* and *Miller*,[244] Ms. Friend has not carried

---

238. *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998).

239. *In re Miller*, 156 F.3d 598, 606 (5th Cir. 1998); *see also In re Caton*, 157 F.3d 1026, 1030 (5th Cir.1998).

240. *See, e.g., In re Hughes*, 184 B.R. 902, 908 (Bankr.E.D.La.1995).

241. Friend's Proposed Findings of Fact, page 24.

242. F. of F. 61.

243. F. of F. 62–64.

244. As evidenced more clearly by the Fifth Circuit opinion in *Corley v. Delaney*, 97 F.3d 800 (5th Cir.1996),an opinion preceding but not overruled by *Kawaauhau* or *Miller*, even this objective test is not met by outrageous conduct on the part of the debtor unless it is proved that he intended not only the wilful and malicious act, but also the injury.

her burden of proving by a preponderance of the evidence that Dr. Provenza's actions with regard to these other assets was substantively certain to cause harm to her financial interest. The court concludes that, even in the face of the abundant evidence of Dr. Provenza's actions with respect to Northshore, Lakeview, Bluevue, and R & P (all entities in which Ms. Friend has a community property interest) as well as the overall context of Dr. Provenza's other actions converting and/or otherwise depleting community assets, Ms. Friend did not prove that Dr. Provenza intended to cause "willful and malicious" injury to her property. Therefore, an exception to discharge under Section 523(a)(6) is not granted.

### c. Exception to Discharge Under 523(a)(15)

Finally, Ms. Friend seeks a determination that her claims against Dr. Provenza are non-dischargeable pursuant to 11 U.S.C. § 523(a)(15). Under § 523(a)(15), such debts are not discharged unless:

(A) The debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependant of the debtor ...; or

(B) Discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to his spouse, former spouse, or child of the debtor

█ All of Ms. Friend's claims in this litigation are within the type of debt "incurred by the debtor in the course of a divorce or separation," potentially excepted from discharge pursuant to 11 U.S.C. § 523(a)(15). In a § 523(a)(15) action, the creditor has the initial burden of showing that section 523(a)(5) does not apply and that section (a)(15) is applicable to the debt.[245] Ms. Friend has met this burden, and the court finds that all of her claims are of a kind that arise in the course of a divorce or separation. Indeed, her partition claims with respect to both the community property of the estate and community property not in the bankruptcy estate arose only with respect to the divorce, which had the effect of terminating the community. Her accounting and reimbursement claims, and her claims for fraud and mismanagement, all arise under the Louisiana Civil Code Articles governing a party's rights and remedies following the termination of the community property regime, which in this case was triggered by the divorce.

█ Upon the initial showing that § 523(a)(15) is applicable, the burden of proof shifts to the debtor who must prove either of the two prongs found at 523(a)(15)(A) and (B).[246] In assessing the debtor's ability to pay under § 523(a)(15)(A), the court looks to the date of the trial as the starting point. The court may also consider the facts and circumstances concerning the debtor's future earning potential. It is not necessary to construct a budget for the debtor, but only to look at all the circumstances, including any sources of supplemental income, which the debtor enjoys, the extent to which the debtor can control his income, and the extent to which the debtor's expenses are self imposed.[247] The court has already found that as a factual matter Dr. Provenza does have the ability to pay his debt to Ms. Friend under § 523(a)(15)(A), and the

**245.** In re Whittaker, 225 B.R. 131, 142 (Bankr.E.D.La.1998).

**246.** Id.

**247.** Whittaker, 225 B.R. at 143.

court now concludes the same as a matter of law.

 Section 523(a)(15)(B) requires the court to balance the equities by considering whether the debtor will "suffer more" by not receiving a discharge of the debts in question than the former spouse would suffer if the obligations were discharged.[248] Courts have applied a totality of the circumstances test. Among the factors that should be considered are:

1. The amount of debt involved, including all payment terms;

2. The current income of the debtor, objecting creditor and their respective spouses;

3. The current expenses of the debtor, objecting creditor and their respective spouses;

4. The current assets, including exempt assets of the debtor, objecting creditor and their respective spouses;

5. The current liabilities, excluding those discharged by the debtor's bankruptcy, of the debtor, objecting creditor and their respective spouses;

6. The health, job skills, training, age, and education of the debtor, objecting creditor and their respective spouses;

7. The dependents of the debtor, objecting creditor and their respective spouses;

8. Any changes in the financial conditions of the debtor and the objecting creditor which may have occurred since the entry of the divorce decree;

9. The amount of debt which has been or will be discharged in the debtor's bankruptcy;

10. Whether the objecting creditor is eligible for relief under the Bankruptcy Code; and

11. Whether the parties have acted in good faith in the filing of the bankruptcy and the litigation of the § 523(a)(15) issues.[249]

 Considering these factors, the court finds that Ms. Friend will suffer substantially more should her claim be discharged, than Dr. Provenza will suffer if Ms. Friend's claim is excepted from discharge.

First, most of Ms. Friend's claim, if not all of it, will be satisfied from assets of the bankruptcy estate. As Ms. Friend receives those funds, Dr. Provenza will receive credit toward the satisfaction of her claim against him. Next, Dr. Provenza has a far greater income and capacity for future income, as demonstrated at trial, than Ms. Friend. In fact, once Dr. Provenza's $100,000.00 per month attorneys' and other professionals' fees abate, the net from his stated monthly income of $67,000.00 will more than double. Next, many of Dr. Provenza's current liabilities are of his own choosing, and he is free to reduce much of that indebtedness by selling or re-financing the valuable real estate and other assets he purchased from the Chapter 7 trustee with borrowed funds. Next, Ms. Friend's eligibility to file bankruptcy is of no moment in this matter, as there are substantially more community assets than community liabilities. Finally, Ms. Friend has acted in good faith at all times in this proceedings. Dr. Provenza has not.

---

**248.** *Id.*

**249.** *Id.* at 143–144.

The court concludes that all of Ms. Friend's claims against Dr. Provenza that are recognized by this court are excepted from discharge pursuant to 11 U.S.C. § 523(a)(15).

## III. CONCLUSION

Before the court are two matters, one being Ms. Friend's proof of claim no. 57 and Dr. Provenza's objection to that claim, and the other being Ms. Friend's adversary complaint brought under 11 U.S.C. § 523(a) objecting to the discharge of her claims against Dr. Provenza. For the foregoing reasons, Dr. Provenza's objection to Ms. Friend's proof of claim no. 57 is overruled. Ms. Friend's proof of claim is allowed, in part. Dr. Provenza's objection to Ms. Friend's proof of claim is denied, in part. The court will enter judgment as follows:

### 1. Ms. Friend's Proof of Claim and Dr. Provenza's Objection to the Proof of Claim

The court concludes and finds that Ms. Friend's proof of claim is hereby allowed in the total amount of $1,592,386.77. This amount is the sum of the four components comprising Ms. Friend's overall claim, as follows:

1. Ms. Friend's half of community surplus remaining after community claims and community administrative expenses are paid from community property proceeds in the bankruptcy estate, pursuant to 11 U.S.C. § 726(c) ... $ 708,960.69[250]

2. Equalizing payment due Ms. Friend by Dr. Provenza on account of Dr. Provenza's retention, use, and/or consumption of exempt and other community property not part of the bankruptcy estate ... 161,518.81

3. Ms. Friend's net reimbursement and accounting claims payable by Dr. Provenza ... 181,074.25

4. Ms. Friend's fraud and/or mismanagement claims against Dr. Provenza ... 540.833.02

TOTAL: ... $1,592,386.77

Alternatively, should the Fifth Circuit render a final and non-appealable judgment affirming the decision of the district court with respect to the Caribe, Troon, and Jesse Wells Road properties, such that those properties are finally determined not to be community property, but rather, properties in which Dr. Provenza and Ms. Friend each had an undivided 50% interest, then Ms. Friend would be entitled to a distribution from escrowed funds held by the trustee in the amount of $564,883.76, and in addition, an allowed proof of claim in the amount of $1,110,644.97, said amount being the sum of four components, as follows:

1. Ms. Friend's half of community surplus remaining after community claims and community administrative expenses are paid from community property proceeds in the bankruptcy estate, pursuant to 11 U.S.C. § 726(c) ... $ 227,218.89[251]

2. Equalizing payment due Ms. Friend by Dr. Provenza on account of Dr. Provenza's retention, use, and/or consumption of exempt and other community property not part of the bankruptcy estate ... 161,518.81

3. Ms. Friend's net reimbursement and accounting claims payable by Dr. Provenza ... 181,074.25

4. Ms. Friend's fraud and/or mismanagement claims against Dr. Provenza ... 540,833.02

TOTAL: ... $1,110,644.97

With respect to both of the above possibilities, the first component (representing Ms. Friend's claim to the community surplus out of community property of the estate) is payable by the trustee out of estate funds generated from community property. The other three components, as well as any deficiency with respect to the

250. This dollar amount is already net of the interim distribution of $150,000.00.

251. This dollar amount is already net of the interim distribution of $150,000.00.

payment of the first component, shall be considered a claim against the separate funds of the bankruptcy estate, including the estate's (Dr. Provenza's) half of the community surplus. In either case, the court's conclusion and finding result in overruling Dr. Provenza's objection to this claim.

### 2. Money Judgment Pursuant to 11 U.S.C. § 523(a)

With respect to Ms. Friend's adversary complaint under 11 U.S.C. § 523(a), the court will render judgment in Ms. Friend's favor in the amount of $1,592,386.77, plus all costs and legal interest from date of judgment, this amount being determined to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(15). Alternatively, and in the event that the district court's decision with respect to Caribe, Troon, and Jesse Wells Road is finally upheld, or the stay of same is vacated, the court renders judgment in Ms. Friend's favor in the amount of $1,110,644.97, plus all costs and legal interest from date of judgment, said amount being determined to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(15).

In addition, $540,833.02 of the judgment is also non-dischargeable pursuant to 11 U.S.C. § 523(a)(4) under either outcome with respect to the matters on appeal. Further, and in order to give meaning to this portion of her overall claim being deemed non-dischargeable, Ms. Friend is hereby authorized to apply payments she receives with respect to her claims first against that portion of her claim *not* excepted from discharge under 11 U.S.C. § 523(a)(4), and then when that portion is paid in full, to the remainder of her claim.[252]

A separate judgment will be entered reflecting the above and ordering the disbursement of funds to Ms. Friend.

---

252. This provision of the judgment will be rendered moot if and at such time the exception to discharge under 523(a)(15) becomes final and non-appealable.